UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

APPEAL NO. 16-6001

UNITED STATES OF AMERICA,
Appellee

v.

DZHOKHAR A. TSARNAEV,
Defendant-Appellant

_____

On Appeal from the United States District
Court for the District of Massachusetts

_____

**BRIEF OF AMICUS CURIAE**
**NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS**
**IN SUPPORT OF APPELLANT DZHOKHAR TSARNAEV**

_____

Submitted by:

David A. Ruhnke, Esq. (#96208)
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042
(973) 744-1000

Michael J. Iacopino, Esq. (#24002)
Brennan Lenehan Iacopino & Hickey
85 Brook Street
Manchester NH 03104
(603) 668-8300

Megan Wall-Wolff, Esq. (#1187075)
Wall-Wolff LLC
90 Broad Street, 22nd Floor
New York, NY 10004
(212) 920-0257

Benjamin Silverman, Esq. (#1187067)
Law Office of Benjamin Silverman PLLC
80 Broad Street, Suite 1900
New York, NY 10004
(212) 203-8074

*Counsel for Amicus Curiae National Association of Criminal Defense Lawyers*

## CORPORATE DISCLOSURE STATEMENT

The National Association of Criminal Defense Lawyers is a not-for-profit voluntary professional bar association without a parent corporation and does not issue any shares of stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT……………………………………..i

TABLE OF CONTENTS…………………………...…………….…………………ii

TABLE OF AUTHORITIES…………………………………………………iii

INTEREST OF AMICUS CURIAE…………………………….…………………1

PRELIMINARY STATEMENT…………………………………………………2

ARGUMENT……………………………………………………………………3

    I.     The Penalty Phase of a Capital Trial..…………………………………3

    II.    Juries Routinely Reject the Death Penalty Even in the Most Aggravated Cases……………………………….…………………7

        A.    Juries Have Rejected the Death Penalty for Acts of Terrorism…...………………………………7

        B.    Juries Often Reject the Death Penalty when Confronting the Most Heinous Murders………………..……………12

    III.    Courts Routinely Vacate Capital Sentences When Errors Undermine Confidence in the Decision To Impose Death………..…..20

CONCLUSION………………………………….……………………………..26

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Buttrum v. Black*,
    721 F. Supp. 1268 (N.D. Ga. 1989)………………..……………22-23

*Cooper v. Sec'y, Dep't of Corr.*,
    646 F.3d 1328 (11th Cir. 2011)………………………………………21, 22

*Douglas v. Woodford*,
    316 F.3d 1079 (9th Cir. 2003)………………………………..……………..24

*Dugas v. Coplan*,
    506 F.3d 1 (1st Cir. 2007)…………..…………………...………….…..20

*Dutton v. Brown*,
    812 F.2d 593 (10th Cir. 1987)…………..………………………………24, 25

*Eddings v. Oklahoma*,
    455 U.S. 104 (1982)………………..………………….………………..5

*Green v. Georgia*,
    442 U.S. 95 (1979)…………………………………………………..5

*Jackson v. State*,
    17 Fla. L. Weekly S237, 599 So. 2d 103 (Fla. 1992)………………...……18

*Johnson v. Bagley*,
    544 F.3d 592 (6th Cir. 2008)…………..…………………………………25

*Lawhorn v. Allen*,
    519 F.3d 1272 (11th Cir. 2008)…………………………………...…22

*Lockett v. Ohio*,
    438 U.S. 586 (1978)…………………………….………………………5

*Mak v. Blodgett*,
    970 F.2d 614 (9th Cir. 1992)………………..……………………20, 21

*McKoy v. North Carolina,*
    494 U.S. 433 (1990)……………….……………………………………5, 6

*Mills v. Maryland,*
    486 U.S. 367 (1988)……………….…………………….……………..6

*People v. Degorski,*
    376 Ill. Dec. 95, 998 N.E. 2d 637 (Ill. App. Ct. 2013)………………………18

*Rompilla v. Beard,*
    545 U.S. 374 (2005)…………...…………………………..……………6, 20, 24

*Skipper v. South Carolina,*
    476 U.S. 1 (1986)……...……………………………..……………..……..6

*State v. Davis,*
    15 So. 3d 361, 370 (La. Ct. App. 2009)………………...……………..17

*State v. Mickelson,*
    149 So. 3d 178 (La. 2014)……………………………..……………15

*State v. Mickelson,*
    210 So. 3d 893 (La. Ct. App. 2016)………………………………...…...15

*Tennard v. Dretke,*
    542 U.S. 274 (2004)…………………………………………………5

*In re Terrorist Bombings of U.S. Embassies in East Africa,*
    552 F.3d 93 (2d Cir. 2008)…………………………..……………7

*United States v. Bin Laden,*
    156 F. Supp. 2d 359 (S.D.N.Y. 2001)………………...……….………..7

*United States v. Candelario-Santana,*
    834 F.3d 8 (1st Cir. 2016)…………...……………………….…13

*United States v. James,*
    712 F.3d 79 (2d Cir. 2013)……………...………….…….…………16

*United States v. Kehoe,*
    310 F.3d 579 (8th Cir. 2002)…………………….……………….12

*United States v. Lee*,
 792 F.3d 1021 (8th Cir. 2015)……………………...…………………………12

*United States v. Lee*,
 2008 WL 4079315 (E.D. Ark. Aug. 28, 2008)……………......…………12

*United States v. McVeigh*,
 153 F.3d 1166 (10th Cir. 1998)…………………………...……………..11

*United States v. Minerd*,
 112 F. App'x 841 (3d Cir. 2004)…………………………...…'………….18

*United States v. Moussaoui*,
 591 F.3d 263 (4th Cir. 2010)………………………….…………………..9

*Wiggins v. Smith*,
 539 U.S. 510 (2003)………………...…………………………………6, 24

*Williams v. Taylor*,
 529 U.S. 362 (2000)…………………………….……………………..23

## Statutes and Rules

18 U.S.C. § 3591(a)…………………………………………………………...4

18 U.S.C. § 3592(a)………………………………………..…………….5

18 U.S.C. § 3593………………………………………………..……...4, 5

Federal Death Penalty Act of 1994,
 Pub. L. No. 103-322, 108 Stat. 1959…………………………………3

Fed. R. App. P. 29……………………………………………………..1

# Other Authorities

Zach Beaird, *No Death Penalty for Mickelson*,
   SHREVEPORT TIMES (Oct. 30, 2015)……………………………..……….15

Alix Bryan & Jake Burns, *Life Sentence for Man*
   *who Murdered  Virginia State Trooper*,
   CBS 2 VIRGINIA (Aug. 3, 2016)………..………………………………17

Daarel Burnette II, Matthew Walberg & Stacy St. Clair,
   *Serial Killer Avoids Death Penalty*,
   CHICAGO TRIBUNE (Dec. 20, 2009)………..…….……………………17

Van Darden & Paul Venema, *Shawn Puente*
   *Sentenced to Life in Prison Without Parole*
   *in Death of SAPD Officer Robert Deckard*,
   KSAT 12 TEXAS (Apr. 6, 2018)……………..…………………………17

Joe Dolinsky, *Con-Ui Juror Speaks Out About*
   *Life Sentence, Lone Holdout*,
   TIMES-LEADER (Jul. 11, 2017)……………….……………………...18

Briana Erickson, *Jury Spares Life of Las Vegas*
   *Man who Killed Girl, Mother*,
   LAS VEGAS REVIEW-JOURNAL (Dec. 5, 2017)………...……………………17

Alan Feuer, *Embassy Bombing Witnesses*
   *Recall Blood, Smoke and Chaos*,
   NEW YORK TIMES (Mar. 8, 2001)……………………………...…………..8

Gwen Filosa, *New Orleans Jury Sentences*
   *Barry Ferguson To Life in Prison for*
   *Raping, Murdering Daughter*,
   THE TIMES PICAYUNE (Apr. 20, 2009)…………………….…………….…..17

Andrew Greiner, *Degorski Jury Set To Tackle Death*
   *Penalty: Juan Luna Was Spared the Death*
   *Penalty*, CHICAGO 5 NEWS (Sept. 30, 2009)……………...……………….18

Tom Hays, *2 Convicted for Life Insurance Killings*,
   WASHINGTON POST (July 3, 2007)…………………….……………….16

Chuck Hickey, *Dexter Lewis Receives Five Life Sentences*
   *Plus 180 Years for Fero's Bar Murders*,
   FOX 31 DENVER (Sept. 30, 2015)……………….……………………18

Phil Hirschkorn, *On Tape, Passengers Heard Trying To
Retake Cockpit*, CNN (Apr. 13, 2006)…………………………………………10

Neil A. Lewis, *Moussaoui Jury Hears From Grieving
Families, and From Victims Themselves*,
NEW YORK TIMES (Apr. 11, 2006)………………………………...………..10

Neil A. Lewis, *Moussaoui, Testifying Again, Voices
Glee Over Witnesses' Accounts of Sept. 11 Grief*,
NEW YORK TIMES (Apr. 14, 2006)………………………….....………………10

Colum Lynch, *Witnesses Describe U.S.
Embassy Bombing Horrors*,
WASHINGTON POST (Mar. 8, 2001)…………...……………………………8

Andrew Meacham, *After 30 Years, Murderer
Richard Cooper Could Get Off Death Row*,
TAMPA BAY TIMES (Mar. 5, 2014)…………………….………………………22

Mitch Mitchell, *Convicted Graham Child Killer
Sentenced to Life in Prison*,
FORT WORTH STAR-TELEGRAM (Mar. 12, 2015)……………...……………17

Carly Moore, *Juror 17 Reveals Details of
Verdict, at Least 1 Theater Shooting
Juror Was Against Death Sentence*,
FOX 31 DENVER (Television Broadcast Aug. 7, 2015)……………………..17

Jim Mendoza, *Naeem Williams Gets Life in Prison
for Killing 5-Year-Old Daughter*,
HAWAII NEWS NOW (June 28, 2014)……………………………..…………19

Dean Narciso, *Brian Golsby Sentenced to Life
Without Parole in Reagan Tokes' Murder*,
THE COLUMBUS DISPATCH (Mar. 21, 2018)……………….....……………..17

Lois Romano, *Nichols Is Spared Death Penalty Again*,
WASHINGTON POST (June 12, 2004)……………….……………..……………11

Jordan Steffen & Matthew Nussbaum, *Dexter Lewis
Gets Life Sentence for Fero's Bar Massacre*,
THE DENVER POST (Aug. 27, 2015)……………………………….…...…..18

Russell Stetler, *The Past, Present, and Future of the Mitigation Profession: Fulfilling the Constitutional Requirement of Individualized Sentencing in Capital Cases*, 46 HOFSTRA LAW REVIEW 1161 (2018)……………...…..……………..3

Staff Report, *Landrum's Life Spared*, DEMOPOLIS TIMES (Mar. 8, 2005)………..…………………………………17

Jamie Stockwell & Jerry Markon, *Gang Members to Get Life in Witness Slaying*, WASHINGTON POST (June 15, 2005)…………..………..……………14

Benjamin Weiser, *Bomber Helped Stab Guard, Jury Is Told*, NEW YORK TIMES (June 21, 2001)…………………………..………………8

## INTEREST OF AMICUS CURIAE[1]

Amicus National Association of Criminal Defense Lawyers ("NACDL") is a not-for-profit voluntary professional bar association that works on behalf of criminal defense attorneys to ensure justice and due process for those accused of crimes or misconduct.  NACDL's members include private criminal defense lawyers, public defenders, military defense counsel, law professors, and judges.  NACDL is the only nationwide professional bar association for public defenders and private criminal defense lawyers.  The American Bar Association recognizes NACDL as an affiliated organization and awards it full representation in its House of Delegates.

NACDL's members include preeminent capital practitioners in both federal and state courts.  Based on extensive experience litigating capital cases, NACDL's members are able to share with the Court an understanding of and appreciation for the willingness of American trial juries to consider mitigation and reach life verdicts even in highly aggravated cases, which is the subject of this brief.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), counsel for amicus curiae state that no counsel for any party authored this brief in whole or in part, and no person other than amicus curiae, its members, and counsel made a monetary contribution to its preparation or submission.  All parties have consented to the motion for acceptance of this amicus brief.

## PRELIMINARY STATEMENT

NACDL respectfully submits this amicus brief to advise the Court that, should it find error in the proceedings below, there is every reason to believe that a properly selected and instructed jury will decline to re-impose the death penalty notwithstanding the extraordinary aggravation in this case.  As the precedents described in this brief illustrate, capital juries routinely weigh mitigation and impose merciful sentences even for the most aggravated and upsetting of crimes.

Appreciation for juries' willingness to give effect to mitigation and choose life sentences even for egregious conduct is important in this case because the district court did not allow for the selection of an impartial jury and precluded the defense from offering evidence concerning, among other things, Dzhokhar Tsarnaev's older brother's history of brutality and proclivity for planning and coordinating acts of homicidal violence – matters which went to the heart of defense arguments about relative culpability during the penalty phase of the trial.

In a case where a young man's life is at stake and a single juror can prevent a capital verdict, the charged conduct cannot, on its own, render harmless clear errors committed at the trial level – particularly the exclusion of mitigation. Rather, the Court should vacate a death sentence if it finds that mitigation was improperly excluded or if it identifies any other error undermining confidence in the decision to impose death.

## ARGUMENT

No facts are too heinous, no conduct too appalling, and no defendant too unsympathetic to rule out a life verdict from a properly empaneled American trial jury presented with compelling mitigation.[2]

As discussed below, even a defendant convicted of the worst crimes is constitutionally entitled to present broad mitigation during the penalty phase of a capital trial and a jury cannot impose the death penalty unless it unanimously finds that the mitigation is outweighed by aggravating factors. The examples discussed in this brief illustrate that properly selected and instructed juries will reach life verdicts in many of the most aggravated capital prosecutions.

Accordingly, courts engaged in post-conviction review will vacate a death sentence upon identifying errors in the penalty-phase proceedings even for the most aggravated offenses.

## I.    The Penalty Phase of a Capital Trial

Pursuant to the procedures provided in the Federal Death Penalty Act of 1994[3] ("FDPA"), after Mr. Tsarnaev was found guilty of capital offenses at a

---

[2] *See generally* Russell Stetler, *The Past, Present, and Future of the Mitigation Profession: Fulfilling the Constitutional Requirement of Individualized Sentencing in Capital Cases*, 46 HOFSTRA L. REV. 1161 app. at 1229-1256 (2018) (cataloguing nearly 200 aggravated capital cases resulting in life sentences).

[3] Pub. L. No. 103-322, 108 Stat. 1959.

traditional guilt-phase trial, a second penalty-phase trial was held during which the

same jury was asked to determine whether the aggravating factors in the case

sufficiently outweighed all of the mitigating factors to justify a sentence of death.[4]

The jury was instructed that, if it unanimously found certain preliminary

factors proved beyond a reasonable doubt,[5] it should proceed to weigh mitigation

and aggravation.  Although a jury may not reach a death sentence unless it

unanimously finds that at least one aggravating factor has been proved beyond a

reasonable doubt,[6] mitigation need only be proved by a preponderance of the

evidence.[7]

---

[4] *See* 18 U.S.C. § 3593(e).

[5] These preliminary findings were whether Mr. Tsarnaev (1) was over eighteen at the time of the offense, 18 U.S.C. § 3591(a), and (2) committed it with requisite mens rea, 18 U.S.C. § 3591(a)(2)(A)-(D).  *See* Penalty Phase Verdict Form at 4-7, *United States v. Tsarnaev*, No. 13-cr-10200 (D. Mass. May 15, 2015), Dkt. No. 1434.

[6] 18 U.S.C. §§ 3591(a)(2), 3593(c), 3593(e).

[7] 18 U.S.C. § 3593(c)-(d).  In this case, the district court followed the standard practice of asking jurors to indicate on a special verdict sheet how many of them found certain listed mitigating factors to have been proved.  *See* Penalty Phase Verdict Form at 16-18, *United States v. Tsarnaev*, No. 13-cr-10200 (D. Mass. May 15, 2015), Dkt. No. 1434.  Jurors were also permitted to write in mitigation findings that were not proposed on the verdict sheet provided to them.  *Id.* at 19-20.

Moreover, any juror who finds a mitigating factor established may consider and weigh it, regardless of whether any other jurors find it proved.[8]  Indeed, the FDPA provides that a sentencing jury "shall consider *any* mitigating factor,"[9] including all evidence "that mitigate[s] against imposition of the death sentence."[10] The statute reflects Congress's attempt to codify a capital defendant's Eighth Amendment right to have the sentencing jury consider all mitigation bearing on the decision to impose capital punishment.[11]

---

[8] 18 U.S.C. § 3593(d) ("A finding with respect to a mitigating factor may be made by 1 or more members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such factor established for purposes of this section regardless of the number of jurors who concur that the factor has been established."); *McKoy v. North Carolina*, 494 U.S. 433, 439-44 (1990); *Mills v. Maryland*, 486 U.S. 367, 375-84 (1988).

[9] 18 U.S.C. § 3592(a) (emphasis added).

[10] 18 U.S.C. § 3592(a)(8).

[11] *E.g.*, *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (capital sentencer may "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death") (emphasis omitted); *Green v. Georgia*, 442 U.S. 95, 97 (1979) (state hearsay rule could not be invoked to bar relevant mitigating evidence); *Eddings v. Oklahoma*, 455 U.S. 104, 114-15 (1982) ("The sentencer . . . may determine the weight to be given relevant mitigating evidence.  But they may not give it no weight by excluding such evidence from their consideration."); *see also Tennard v. Dretke*, 542 U.S. 274, 284-85 (2004) (rejecting view that evidence needs to have some nexus to the crime to be mitigating; "[r]elevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a factfinder could reasonably deem to have mitigating value.") (quoting *McKoy*, 494 U.S. at 440).

Each juror has complete discretion in weighing the mitigation to reach the moral, and personal, decision about the propriety of sentencing a particular defendant to death.

Absent a unanimous finding by the jury that death is appropriate, a sentence less than death will be imposed.[12]  Thus, in federal capital proceedings, each member of the jury has the power to prevent the infliction of capital punishment if she finds that it is unwarranted based on an individualized assessment of the offender.

Because only one juror is needed to choose life over death, each and every challenge and strike during jury selection becomes outcome-determinative.  Further, because any single juror's mitigation finding can prevent a death sentence, preclusion of material mitigation is reversible error.[13]

---

[12] *See Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (finding prejudice for purposes of habeas petition because had certain mitigation been presented "there is a reasonable probability that at least one juror would have struck a different balance.").

[13] *E.g.*, *Skipper v. South Carolina*, 476 U.S. 1, 8 (1986).  Relatedly, unexplained failure to present mitigation evidence constitutes ineffective assistance of counsel.  *E.g.*, *Rompilla v. Beard*, 545 U.S. 374, 390-93 (2005).

## II.    Juries Routinely Reject the Death Penalty Even in the Most Aggravated Cases

As illustrated by the cases below, jurors have declined to impose death sentences after weighing mitigation in many of the most aggravated capital prosecutions.

### A.    Juries Have Rejected the Death Penalty for Acts of Terrorism

Even for defendants convicted of terrorist attacks and bombings, death sentences are by no means a foregone conclusion.  In fact, juries have declined to return death verdicts against many defendants convicted of perpetrating the largest terrorist attacks ever prosecuted in American courts.[14]

Jurors rejected the death penalty for two Al Qaeda members who were found to be directly responsible for the 1998 bombings of United States embassies in Kenya and Tanzania that killed 224 people and injured thousands more.[15] Surviving American diplomats described the carnage during the penalty phase of

---

[14] Penalty-phase verdict form from federal capital cases since 1991 are available on the website of the Federal Death Penalty Resource Counsel: https://fdprc.capdefnet.org/verdict-forms.

[15] *See In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93 (2d Cir. 2008); *United States v. Bin Laden*, 156 F. Supp. 2d 359 (S.D.N.Y. 2001).

the trial, including having witnessed colleagues decapitated and crushed.[16]  The
explosions destroyed a passing school bus outside one of the embassies, killing
children in their seats.[17]  So many were killed that it took prosecutors over twenty
minutes to read the names of the dead, and jurors wept as they listened to the list of
victims.[18]  As with the Marathon bombing, the embassy attacks also resulted in
life-changing injuries – there were thousands of victims whose limbs were sheared
off, and who suffered permanent loss of vision and other serious physical harm.[19]

Yet the death penalty was not imposed on the two men capitally prosecuted
in the United States for their involvement in those acts of terror.  Khalfan
Mohamed had helped assemble one of the bombs and, while awaiting trial, was
involved in the stabbing of an American prison guard in the eye, causing
permanent brain damage.[20]  Jurors nonetheless found it mitigating that more
culpable members of the conspiracy would not be subject to the death penalty, and

---

[16] Colum Lynch, *Witnesses Describe U.S. Embassy Bombing Horrors*,
WASH. POST (Mar. 8, 2001).

[17] *Id.*

[18] Alan Feuer, *Embassy Bombing Witnesses Recall Blood, Smoke and Chaos*,
N.Y. TIMES (Mar. 8, 2001).

[19] *Id.*; Lynch, *supra* note 16.

[20] Benjamin Weiser, *Bomber Helped Stab Guard, Jury Is Told*, N.Y. TIMES
(June 21, 2001).

that Mohamed lacked a criminal history, was not a leader or organizer of the bombing conspiracy, and was kind, generous, and hardworking in other areas of his life.[21]

The jury also declined to reach a death verdict for Mohamed Rashed Daoud Al-'Owhali, who helped transport the bomb that killed hundreds at the American embassy in Nairobi and threw a flash grenade to distract Marine sentries just before the explosion. Jurors were persuaded by mitigation evidence including that Al-'Owhali's execution might not alleviate the pain caused to the victims' families and instead may have turned him into a martyr for Al Qaeda's cause.[22]

A life verdict was also obtained for Zacharias Moussaoui, the man once known as "the twentieth hijacker," who was charged in the 9/11 conspiracy and subsequent attacks and who concealed the ongoing Al Qaeda conspiracy following his pre-9/11 arrest.[23] During the penalty phase of Moussaoui's trial, jurors were shown evidence that powerfully revived the shock and terror of September 11, 2001. They heard screams recorded from the cockpit of United Flight 93, where

---

[21] Penalty Phase Verdict Form at 12-14, *United States v. Mohamed*, No. 98-cr-1023 (S.D.N.Y. July 10, 2001), Dkt. No. 585. Nine jurors also noted that Mr. Mohamed had provided helpful information to law enforcement agents. *Id.*

[22] Penalty Phase Verdict Form at 12-14, *United States v. Al-'Owhali*, No. 98-cr-1023 (S.D.N.Y. June 12, 2001), Dkt. No. 574. Ten jurors also found that Al-'Owhali viewed the embassies as a military target. *Id.*

[23] *See United States v. Moussaoui*, 591 F.3d 263, 301 n.24 (4th Cir. 2010).

the hijackers slashed passengers' throats, and emergency calls from doomed office workers trapped in the towers, pleading that "we're not ready to die" and "oh, please hurry; I've got young kids."[24]

Moussaoui took the witness stand to express his "delight" at hearing these accounts of human suffering.[25] Addressing survivors who had appeared in court, Moussaoui told the jury he regretted that they had lived and that he remained determined to kill Americans, even in prison.[26] When asked if he would "do it again tomorrow," Moussaoui responded, "today."[27] The jury unanimously concluded that he lacked remorse.[28]

But even Moussaoui's delight in the carnage and his complete lack of contrition was not enough to convince twelve jurors that he should be executed. Instead, jurors were persuaded by mitigating evidence that Moussaoui had a

---

[24]  Phil Hirschkorn, *On Tape, Passengers Heard Trying To Retake Cockpit*, CNN (Apr. 13, 2006); Neil A. Lewis, *Moussaoui Jury Hears From Grieving Families, and From Victims Themselves*, N.Y. TIMES (Apr. 11, 2006).

[25] Neil A. Lewis, *Moussaoui, Testifying Again, Voices Glee Over Witnesses' Accounts of Sept. 11 Grief*, N.Y. TIMES (Apr. 14, 2006).

[26] *Id.*

[27] *Id.*

[28] Special Verdict Form at 5, *United States v. Moussaoui*, No. 01-cr-455 (E.D. Va. May 3, 2006), Dkt. No. 1852.

difficult childhood, had spent time in orphanages, was not a leader of the 9/11 attacks, and was primarily involved in plotting subsequent attacks.[29]  A comprehensive mitigation case was able to persuade jurors to spare the life of a man who bragged about his "delight" at the vast death and destruction that he helped bring about, who mocked survivors of his terror, and who vowed to kill more if able.[30]

---

[29] *Id.* at 6-8.  Jurors notably rejected – unanimously – any notion that Moussaoui was "ineffectual" as a member of Al Qaeda or that he suffered from a "psychotic disorder." *Id.* at 8.  Three jurors concluded that his role in the 9/11 attacks was "minor." *Id.*

[30] Two separate juries – in both federal and state court – likewise deadlocked, sparing the life of Terry Nichols, who was convicted of conspiring with Timothy McVeigh to bomb the Alfred P. Murrah Federal Building in Oklahoma City, killing 168 people and destroying a pre-school. *See United States v. McVeigh*, 153 F.3d 1166, 1176-79 (10th Cir. 1998); Lois Romano, *Nichols Is Spared Death Penalty Again*, WASH. POST (June 12, 2004).  Although Nichols was a far less active participant in the bombing than McVeigh and was not in Oklahoma when it occurred, the federal jury that spared his life did so despite convicting him of conspiracy to use a weapon of mass destruction and finding that deaths were a foreseeable result of his actions.  Verdict Sheet at 1-2, *United States v. Nichols*, 96-cr-68 (D. Col. Dec. 23, 1997), Dkt. No. 5814.

### B.     Juries Often Reject the Death Penalty when Confronting the Most Heinous Murders

Beyond terrorism cases, juries also routinely reject the death penalty in many of the most disturbing capital prosecutions.

For example, a jury did not return a death verdict for white supremacist Chevie Kehoe, who was influenced by older relatives when, as a teenager, he participated in the gruesome robbery and murder of an eight-year-old girl and her parents by putting bags over their heads, binding them with duct tape, weighting them down with rocks, and dumping them into a bayou.[31]  Although Kehoe's partner in the murder, Daniel Lee, was sentenced to death,[32] Kehoe was spared by a jury that unanimously concluded that he was a teenager at the time of the offense, his extremist views were encouraged by his family and his parents' friends, and he "was influenced by his father to commit crimes." [33]  A majority of jurors concluded that Kehoe's father (and co-defendant) helped plan the robbery of the family that was brutally murdered and that Kehoe lacked a prior criminal record.[34]

---

[31] *See United States v. Kehoe*, 310 F.3d 579, 584 (8th Cir. 2002).

[32] Daniel Lee's death sentence was vacated and reinstated in ongoing Section 2255 litigation.  *See United States v. Lee*, 792 F.3d 1021 (8th Cir. 2015); *United States v. Lee*, 2008 WL 4079315 (E.D. Ark. Aug. 28, 2008).

[33] Special Verdict Form William Mueller Murder at 7-9, No. 97-cr-243 (E.D. Ark. May 10, 1999), Dkt. No. 813.

[34] *Id.* at 9.

More mature and less sympathetic defendants have also been spared the death penalty. A life verdict was obtained for Alexis Candelario who, less than one year after being released from prison for twelve homicides, went on to shoot nine people to death and wounded more than a dozen others during the opening celebration of an establishment owned by one of his rivals.[35] Candelario's victims included a woman who was eight-months pregnant and a nine-year-old girl.[36] The jury heard evidence that Candelario and his partner fired at people on the street before shouting towards victims huddled inside that "no one gets out alive."[37] The jury nonetheless found it sufficiently mitigating, *inter alia*, that: (1) Candelario was raised amidst violence and narcotics trafficking by a mother who was overwhelmed and without positive male role models, (2) he was "a human being whose life has value," (3) he had dropped out of school in sixth grade to work and earn money for his family and (4) the system had "failed" him.[38]

---

[35] *See United States v. Alexis Candelario-Santana*, 834 F.3d 8 (1st Cir. 2016); Penalty Phase Closing Transcript at 36-37, *United States v. Candelario*, No. 3:09-cr-427 (D.P.R. Mar. 22, 2013), Dkt. No. 1129.

[36] Penalty Phase Closing Transcript at 37, *United States v. Candelario*, No. 3:09-cr-427 (D.P.R. Mar. 22, 2013), Dkt. No. 1129.

[37] *Id.*

[38] Penalty Phase Verdict Form, *United States v. Candelario*, No. 3:09-cr-427 (D.P.R. Mar. 23, 2013), Dkt. No. 1051.

Juries have also been merciful toward MS-13 members, including two young men who murdered a pregnant seventeen-year-old because she was cooperating with law enforcement against the gang.[39]  Jurors concluded that one of the defendants, Ismael Cisneros, had suffered a difficult and abusive childhood, including introduction to drugs and alcohol at a young age and subjection to sexual abuse.[40]  Jurors found that the other defendant, Oscar Grande, had himself been victimized by violence, was only twenty years old at the time of the murder, and feared retaliation if he did not participate.[41]  Jurors also observed that the defendants were young and considered MS-13 a place where they felt accepted or as though they were part of a "family."[42]  Six jurors took the initiative to write on the verdict sheet a mitigation finding they developed on their own:  that "life in

---

[39] Jamie Stockwell & Jerry Markon, *Gang Members to Get Life in Witness Slaying*, WASH. POST (June 15, 2005).

[40] Cisneros Verdict Form at 17-24, *United States v. Cisneros*, 1:04-cr-283 (E.D. Va. June 14, 2005), Dkt. No. 596.

[41] Grande Verdict Form at 17-23, *United States v. Grande*, 1:04-cr-283 (E.D. Va. June 14, 2005), Dkt. No. 595.

[42] Grande Verdict Form at 18-19, *United States v. Grande*, 1:04-cr-283 (E.D. Va. June 14, 2005), Dkt. No. 595; Cisneros Verdict Form at 21, *United States v. Cisneros*, 1:04-cr-283 (E.D. Va. June 14, 2005), Dkt. No. 596.

prison without release will give" each "defendant the opportunity to reach out to the Hispanic youth on the negative aspects of gang activities and involvement."[43]

A jury in Louisiana unanimously recommended life in prison for Eric Mickelson, who killed and dismembered a World War II veteran, even after it viewed dozens of enlarged photographs of the victim's body parts and heard that Mickelson had confessed to killing and dismembering another victim whose remains were never recovered.[44] Mickelson was originally sentenced to death but the Supreme Court of Louisiana vacated his sentence because the trial court erroneously denied a cause challenge to a juror who expressed unwillingness to consider valid mitigation evidence when determining whether to impose capital punishment.[45] On remand, the properly selected trial jury unanimously rejected the death penalty.[46] Mickelson's case powerfully illustrates the effect that even one

------

[43] Grande Verdict Form, *United States v. Grande*, 1:04-cr-283, Dkt. No. 595 (E.D. Va. June 14, 2005); Cisneros Verdict Form, *United States v. Cisneros*, 1:04-cr-283 (E.D. Va. June 14, 2005), Dkt. No. 596.

[44] *See State v. Mickelson*, 210 So. 3d 893 (La. Ct. App. 2016); Zach Beaird, *No Death Penalty for Mickelson*, SHREVEPORT TIMES (Oct. 30, 2015).

[45] *See State v. Mickelson*, 149 So. 3d 178, 194 (La. 2014). The mitigation included that Mickelson had drug problems, may have been delusional, and that his son made an emotional appeal to be allowed to keep his father in his life. *See* Beaird *supra* note 44.

[46] Beaird *supra* note 44.

mistake during jury selection can have on the dynamic of a deliberating capital jury – where life and death hang in the balance.

Notably, jurors have rejected death sentences even in cases where the verdict forms reflect hardly any mitigation findings at all. For example, a jury delivered a life verdict for two defendants who operated a murder-for-hire scheme that killed four people to collect life insurance payouts.[47] The jury rejected the death penalty in the absence of any significant mitigation findings and despite its unanimous conclusion that the defendants acted in a cruel and heinous manner, targeted vulnerable victims, acted for pecuniary gain, and had not proved themselves to be capable of either kindness or generosity in any aspect of their lives.[48]

Juries have declined to return unanimous death verdicts in many of the most aggravated cases involving murders of police officers and other members of law

---

[47] *See United States v. James*, 712 F.3d 79 (2d Cir. 2013); Tom Hays, *2 Convicted for Life Insurance Killings*, WASH. POST (July 3, 2007).

[48] Penalty Phase Verdict Forms, *United States v. James*, No. 02-Cr-778 (E.D.N.Y. Oct. 2, 2007), Dkt. No. 563; Penalty Phase Verdict Form at 4-9, *United States v. Mallay*, No. 02-Cr-778 (E.D.N.Y. Oct. 2, 2007), Dkt. No. 564.

enforcement,[49] men who raped and murdered multiple victims,[50] and murders of children.[51]  Examples include defendants who:

- Slaughtered twelve people and wounded seventy more in a mass shooting at an Aurora, Colorado movie theater.[52]

---

[49] *E.g.*, Van Darden & Paul Venema, *Shawn Puente Sentenced to Life in Prison Without Parole in Death of SAPD Officer Robert Deckard*, KSAT 12 TEX. (Apr. 6, 2018); Alix Bryan & Jake Burns, *Life Sentence for Man who Murdered Virginia State Trooper*, CBS 2 VA. (Aug. 3, 2016).

[50] *E.g.*, *State v. Davis*, 15 So. 3d 361, 370 (La. Ct. App. 2009) (Life verdict for man convicted of raping woman and burning her in the trunk of a car); Dean Narciso, *Brian Golsby Sentenced to Life Without Parole in Reagan Tokes' Murder*, THE COLUMBUS DISPATCH (Mar. 21, 2018) (Life sentence for man who raped and murdered Ohio State student months before her graduation; mitigation included that he was a rape victim raised in abusive circumstances); Daarel Burnette II, Matthew Walberg & Stacy St. Clair, *Serial Killer Avoids Death Penalty*, CHI. TRIB. (Dec. 20, 2009) (Jury spared life of man who killed eleven women over six years).

[51] *E.g.*, Mitch Mitchell, *Convicted Graham Child Killer Sentenced to Life in Prison*, FORT WORTH STAR-TELEGRAM (Mar. 12, 2015) (Life verdict for man who killed his two-year-old and eight-month-old sons, then hung the baby's body from a closet ceiling and sent a picture to the children's mother); Gwen Filosa, *New Orleans Jury Sentences Barry Ferguson To Life in Prison for Raping, Murdering Daughter*, THE TIMES PICAYUNE (Apr. 20, 2009); Briana Erickson, *Jury Spares Life of Las Vegas Man who Killed Girl, Mother*, LAS VEGAS REV.-J. (Dec. 5, 2017); Staff Report, *Landrum's Life Spared*, DEMOPOLIS TIMES (Mar. 8, 2005) (Alabama Jury returned life verdict for man who murdered a three-year-old and her grandmother during burglary).

[52] Carly Moore, *Juror 17 Reveals Details of Verdict, at Least 1 Theater Shooting Juror Was Against Death Sentence*, FOX 31 DENVER (Television Broadcast Aug. 7, 2015).  Although the jury rejected James Holmes's insanity defense, at least one juror found his mental health sufficiently mitigating to warrant life in prison.  *Id.*

- Used a pipe bomb to kill his pregnant girlfriend and her three-year-old daughter and who later told police he was upset that his girlfriend refused to have an abortion.[53]

- Kidnapped three adults and two young children, ages four and fourteen months, from their home and confined them to a car, where the adults were shot to death, the car was set on fire, and the children died of smoke inhalation.[54]

- Stabbed five people to death in a bar and then set the bar and the dead bodies on fire.[55]

- Murdered seven workers in a fast food restaurant, slit at least one person's throat "ear to ear," and stuffed the bodies into a freezer.[56]

- Killed a prison guard on videotape by stabbing him over 200 times over the course of more than ten minutes, pausing to chew a stick of gum that he took from his victim.[57]

---

[53] *United States v. Minerd*, 112 F. App'x 841 (3d Cir. 2004).

[54] *Jackson v. State*, 17 Fla. L. Weekly S237, 599 So. 2d 103, 105-06 (Fla. 1992). Applying Florida's judicial override, the trial judge rejected the jury's recommendation, but the Florida Supreme Court later reversed, holding that the life sentence was reasonable in light of mitigating evidence. *Id.* at 106, 110.

[55] Jordan Steffen & Matthew Nussbaum, *Dexter Lewis Gets Life Sentence for Fero's Bar Massacre*, THE DENVER POST (Aug. 27, 2015); Chuck Hickey, *Dexter Lewis Receives Five Life Sentences Plus 180 Years for Fero's Bar Murders*, FOX 31 DENVER (Sept. 30, 2015).

[56] *People v. Degorski*, 376 Ill. Dec. 95, 998 N.E. 2d 637 (Ill. App. Ct. 2013); Andrew Greiner, *Degorski Jury Set To Tackle Death Penalty: Juan Luna Was Spared the Death Penalty*, CHI. 5 NEWS (Sept. 30, 2009).

[57] Joe Dolinsky, *Con-Ui Juror Speaks Out About Life Sentence, Lone Holdout*, TIMES-LEADER (Jul. 11, 2017). The jury voted eleven to one for death, *id.*, emphasizing that only one juror needs to be persuaded by the defense's mitigation to avoid a death sentence.

- Killed his five-year-old daughter after torturing her for months, including subjecting her to starvation, binding her with duct tape, and beatings.[58]

In short, there simply is no set of facts too barbaric and no defendant too unsympathetic or lacking in remorse for a capital sentence to become inevitable. Only a fraction of federal offenders are subject to an authorized death penalty prosecution, and only one third of those capital trials result in a death sentence.[59] Of the fraction of federal capital cases that are authorized, the government has exercised its discretion to consent to a non-death disposition or otherwise withdraw authorizations in cases of bombings and multiple victims.[60] Even in the most aggravated cases, mitigation far less compelling than what Dzhokhar Tsarnaev would be able to present at a new trial has moved jurors, and it only takes a single juror to prevent a death sentence.

---

[58] Jim Mendoza, *Naeem Williams Gets Life in Prison for Killing 5-Year-Old Daughter*, HAW. NEWS NOW (June 28, 2014).

[59] The Federal Death Penalty Resource Counsel's statistics reflect that 64% of the capital trials in federal court since 1988 have resulted in life sentences. *See* Federal Death Penalty Resource Counsel, *Current Statistics About Use of Federal Death Penalty* (July 30, 2018), *available at* https://fdprc.capdefnet.org/doj-activity/statistics/current-statistics-re-use-of-federal-death-penalty-february-2017.

[60] *E.g.*, *United States v. Kaczynski*, No. 96-cr-259 (E.D. Cal.) ("Unabomber" who killed at least seven people permitted to enter eve-of-trial plea); *United States v. Rudolph*, No. 00-cr-422 (N.D. Ala.) (Serial bomber of Atlanta Olympics and abortion clinics permitted to plead guilty weeks before trial); *United States v. Furrow*, No. 99-cr-838 (C.D. Cal.) (Mass shooter of Jewish community center who killed postal worker permitted to plead guilty).

### III. Courts Routinely Vacate Capital Sentences When Errors Undermine Confidence in the Decision To Impose Death

In recognition of an American trial jury's willingness to return a life verdict no matter how aggravated the offense, courts engaged in post-conviction review have vacated death sentences upon identifying errors undermining confidence in a capital verdict, and in particular when factfinders were not presented with material mitigation suggesting that others were more culpable in the crime.[61]

This is true even on habeas review, where a defendant must meet the exacting standard of showing a reasonable probability of a different outcome but for the error.[62] In *Mak v. Blodgett*, the Ninth Circuit granted a Section 2254 petition vacating the death sentence imposed on Kwan Fai Mak, who, with two others, tied up, robbed, and shot fourteen people, thirteen of whom died. Mak had been precluded by the trial court from offering "irrelevant" evidence that another defendant had "planned the massacre."[63] The Ninth Circuit reversed, observing that "[w]hether Mak was the planner of the massacre went to his relative

---

[61] *E.g.*, *Rompilla*, 545 U.S. at 390-93 (vacating death sentence imposed on defendant found guilty of stabbing and setting victim on fire, and who had prior convictions for rape, robbery and assault; held that failure to investigate and present mitigation concerning defendant's childhood and mental health created reasonable probability of different outcome on remand).

[62] *E.g.*, *id.*; *see generally Dugas v. Coplan*, 506 F.3d 1, 9 (1st Cir. 2007) (addressing prejudice threshold for habeas petition).

[63] *Mak v. Blodgett*, 970 F.2d 614, 616, 622 (9th Cir. 1992).

culpability" and that its exclusion "was an error of constitutional magnitude."[64] The Ninth Circuit concluded that the exclusion of this evidence could well have altered the jury's assessment of Mak's culpability and it therefore undermined confidence in the death sentence.[65]

Likewise, the Eleventh Circuit vacated Richard Cooper's Florida state court conviction for murdering three people in the course of a home invasion because the jury had not heard critical mitigation evidence demonstrating that Cooper, who was eighteen at the time of the offense, was subject to the domination of his co-defendant and did not initiate the murders.[66] Cooper's victims were found bound with duct tape on a living room floor with shotgun wounds to the backs of their heads; one of the victim's eight-year-old sons was "taped up" and confined in a bathroom while his father was murdered; and Cooper was reportedly unemotional when he confessed to police.[67] The Eleventh Circuit nonetheless granted Cooper's habeas petition and vacated his death sentence because defense counsel failed to

---

[64] *Id.* at 622-23.

[65] *Id.* at 623-24 ("Mak argues he had a constitutional right to present *all* relevant mitigating evidence related to his character or the circumstances of the offense at the sentencing phase of his trial. We agree.") (emphasis in original).

[66] *See Cooper v. Sec'y, Dep't of Corr.*, 646 F.3d 1328 (11th Cir. 2011).

[67] *Id*. at 1332-35.

present mitigating evidence of Cooper's extensive physical and psychological abuse by his father and older brother, including a psychologist's report opining that this abuse caused Cooper to be dependent on older men – men such as his co-defendant, who had ordered him to shoot the victims.[68]  The Eleventh Circuit concluded that this mitigation created a reasonable probability of a different outcome on remand.[69]  And, in fact, after hearing that mitigating evidence a new penalty phase jury voted against the death penalty and Cooper was sentenced to life in prison.[70]

Janice Buttrum's case is also illustrative.  Buttrum and her husband were convicted in Georgia state court of raping, sodomizing, and murdering a woman by stabbing her ninety-seven times.[71]  Despite the aggravated nature of the crime, a federal district court vacated Buttrum's death sentence because the state court had excluded mitigating evidence of her husband's violent history, that he had

---

[68] *Id*. at 1342-52.

[69] *Id.* at 1356.

[70] Andrew Meacham, *After 30 Years, Murderer Richard Cooper Could Get Off Death Row*, TAMPA BAY TIMES (Mar. 5, 2014).

[71] *Buttrum v. Black*, 721 F. Supp. 1268, 1272 (N.D. Ga. 1989); *see also Lawhorn v. Allen*, 519 F.3d 1272, 1296-97 (11th Cir. 2008) (granting Section 2254 petition because defense lawyer waived closing argument and did not argue to jury facts providing compelling evidence of youth and "substantial domination" by another person when committing the murder).

expressed prior urges to rape women, and that he had previously attacked his mother with a butcher's knife and scissors.[72]  The district court found that this error was not harmless because the evidence rebutted the prosecution's theory that Buttrum was the primary actor in the crime, and constituted material proof of Buttrum's argument that she was acting under her husband's domination and influence.  The court held that a new penalty trial was constitutionally required under these circumstances because the excluded "evidence was unique" in that "it strongly showed, like no other, that [the husband] could have been the dominant actor in this crime."[73]

The Supreme Court similarly recognizes that the absence of important mitigation evidence from a penalty proceeding may be prejudicial even where the defendant's conduct is egregious.  In *Williams v. Taylor*, a defendant was found guilty of murdering an elderly man and committing other assaults and thefts, including "brutally assault[ing] an elderly woman" so severely he left her in a "vegetative state."[74]  Nonetheless, the court concluded that the failure to present evidence of childhood deprivation and possible intellectual disability created a

---

[72] *Id*. at 1314-15.

[73] *Id.* at 1315.

[74] 529 U.S. 362, 368 (2000).

sufficient probability of an altered outcome to warrant reversal even in the face of the defendant's abhorrent conduct.[75]

Other notable examples where courts provided post-conviction relief to individuals sentenced to death for highly aggravated murders include:

- Finding that counsel was constitutionally deficient for failing to investigate mitigation, the Ninth Circuit granted a Section 2254 petition and vacated the death sentence of a man who bound, raped, tortured, and murdered two teenaged girls.[76] Counsel had failed to investigate his client's social history, including his Dickensian childhood and later commendations in the Marine Corps.[77]  The Ninth Circuit observed that "[t]he gruesome nature of the killing did not necessarily mean the death penalty was unavoidable" because the absent mitigation "could have invoked sympathy from at least one member of the jury at the penalty phase."[78]

- Presiding en banc, the Tenth Circuit reversed a murder conviction because the trial court improperly excluded mitigating evidence offered by the defendant's mother.[79]  The precluded testimony included information about the defendant's family background,

---

[75] *Id.* at 396-99.  As the Supreme Court has observed in another case where it vacated a death sentence because material mitigation was not placed before the jury, "although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test." *Rompilla*, 545 U.S. at 393. Instead, even on habeas it is sufficient even in the most aggravated cases to show that the new mitigation "might well have influenced the jury." *Wiggins*, 539 U.S. at 538.

[76] *Douglas v. Woodford*, 316 F.3d 1079, 1090 (9th Cir. 2003).

[77] *Id.* at 1087-91.

[78] *Id.* at 1091.

[79] *Dutton v. Brown*, 812 F.2d 593, 601-02 (10th Cir. 1987) (en banc).

medical history, and education, and in particular his immaturity, learning difficulties, and tendency to follow others.[80]

- The Sixth Circuit vacated the death sentence of a man who confessed to beating his neighbor to death with a baseball bat while burglarizing her home because his counsel was constitutionally deficient for failing to present mitigation evidence concerning a traumatic childhood.[81]

Across the country, courts recognize that even in the most aggravated cases, improper preclusion of mitigation evidence can prove decisive when jurors are choosing between life in prison and capital punishment. No case has been too aggravated, grotesque, or disturbing to prevent courts from vacating death sentences when they identify errors affecting the integrity of capital proceedings.

Here, the jury was provided an incomplete portrayal of Dzhokhar Tsarnaev's role in the offense: the district court precluded critical evidence that Tamerlan Tsarnaev had committed horrific acts of violence, and had influenced another person to commit those crimes with him. This Court should join those around the country vacating death sentences under similar circumstances in recognition of the likelihood that at least one juror will reach a different conclusion when permitted to see the complete picture of Dzhokhar Tsarnaev's less culpable role.

---

[80] *Id.* at 601.

[81] *Johnson v. Bagley*, 544 F.3d 592, 594, 604-07 (6th Cir. 2008).

## CONCLUSION

A properly selected and instructed trial jury permitted to hear all relevant mitigation could reasonably be expected to reject a death sentence for Dzhokhar Tsarnaev. It is impossible to predict what mitigation will sway a juror, and it only takes one juror to save Mr. Tsarnaev's life. Any error that may have affected even a single juror's decision to vote for death cannot be deemed harmless beyond a reasonable doubt.

Respectfully Submitted,

 /s/ Michael J. Iacopino
David A. Ruhnke, Esq.                  Michael J. Iacopino, Esq.
Court of Appeals # 96028               Court of Appeals # 24002
Ruhnke & Barrett                       Brennan Lenehan Iacopino & Hickey
47 Park Street                         85 Brook Street
Montclair, NJ 07042                    Manchester, NH 03104
Tel: (973) 744-1000                    Tel: (603) 668-8300
dr@ruhnkebarrett.com                   miacopino@brennanlenehan.com

Megan Wall-Wolff, Esq.                 Benjamin Silverman, Esq.
Court of Appeals # 1187075             Court of Appeals # 1187067
Wall-Wolff LLC                         Law Office of Benjamin Silverman
90 Broad Street, 22nd Floor            80 Broad Street, Suite 1900
New York, NY 10004                     New York, NY 10004
Tel: (212) 920-0257                    Tel: (212) 203-8074
mwallwolff@wallwolff.com               bsilverman@bsilvermanlaw.com

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6,110 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ Michael J. Iacopino
MICHAEL J. IACOPINO

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, including counsel for all parties. I further certify that nine bound copies will be mailed to the Clerk of Court if the Court grants the motion for acceptance of this brief.

/s/ Michael J. Iacopino
MICHAEL J. IACOPINO