No. 16-6001

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

**UNITED STATES,**
Appellee

v.

**DZHOKHAR A. TSARNAEV,**
Defendant – Appellant.

**SUPPLEMENTAL REPLY BRIEF
FOR DEFENDANT-APPELLANT DZHOKHAR A. TSARNAEV
REGARDING UNRESOLVED ISSUES**

Ginger D. Anders, Esq.
Court of Appeals # 1182436
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW
Suite 500E
Washington, DC 20001
Tel.: (202) 220-1100
GINGER.ANDERS@MTO.COM

Cliff Gardner, Esq.
Court of Appeals # 1178109
LAW OFFICES OF
  CLIFF GARDNER
1448 San Pablo Ave.
Berkeley, CA 94702
(310) 524-1093
CASETRIS@AOL.COM

Daniel Habib, Esq.
Court of Appeals # 1173462
Deirdre D. von Dornum, Esq.
Court of Appeals # 11713158
David Patton, Esq.
Court of Appeals # 1173507
Mia Eisner-Grynberg, Esq.
Court of Appeals # 1186916
FEDERAL DEFENDERS OF NEW
  YORK, INC.
52 Duane Street, 10th Floor
New York, NY 10007
(212) 417-8769
DANIEL_HABIB@FD.ORG
DEIRDRE_VONDORNUM@FD.ORG
DAVID_PATTON@FD.ORG
MIA_EISNER-GRYNBERG@FD.ORG

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

ARGUMENT ........................................................................................................ 3

    I.      The District Court's Denial Of Tsarnaev's Cause Challenges To Two Jurors Who Lied During Voir Dire, And The Court's Refusal To Investigate Tsarnaev's Colorable Claim Of Juror Dishonesty, Violated The Fifth, Sixth, And Eighth Amendments. ............................. 3

        A.     The Supreme Court's opinion does not address, and therefore has no relevance to, Tsarnaev's juror-misconduct claim. ................................................................................. 3

        B.     Tsarnaev is entitled to a new penalty phase, or at a minimum, remand. ................................................................. 6

    II.     Admission Of The Fruit Of Tsarnaev's Coerced Confession Without A Judicial Determination Of Voluntariness Or An Independent Source Violated The Fifth Amendment ........................... 14

CONCLUSION .................................................................................................. 15

# TABLE OF AUTHORITIES

**Cases**
In re Tsarnaev, 780 F.3d 14 (1st Cir. 2015) ..................................................................2
McDonough Power Equip. v. Greenwood, 464 U.S. 548 (1984) ..............................5
Sinclair v. United States, 279 U.S. 749 (1929) ..........................................................2, 4
United States v. French, 977 F.3d 114 (1st Cir. 2020 ("French II") ............. 9, 10, 12
United States v. Guzman Loera, 24 F.4th 144 (2d Cir. 2022) .......................... 12, 13
United States v. Kuljko, 1 F.4th 87 (1st Cir. 2021) ....................................................9
United States v. Maldonado-Pena, 4 F.4th 1 (1st Cir. 2021) ............................ 3, 5, 9
United States v. O'Brien, 972 F.2d 12 (1st Cir. 1992) ..............................................7
United States v. O'Neal, 17 F.4th 236 (1st Cir. 2021) ............................................15
United States v. Ramirez-Rivera, 800 F.3d 1 (1st Cir. 2015) ...................................6
United States v. Reyes, 24 F.4th 1 (1st Cir. 2022) ...................................................14
United States v. Tsarnaev, 142 S. Ct. 1024 (2022) ......................................... 4, 5, 11

**Rules**
Fed. R. Crim. P. 12(b)(3) ............................................................................................14
Fed. R. Crim. P. 12(c)(3) ............................................................................................14
Sup. Ct. R. 14.1(a) ....................................................................................................2, 4

Dzhokhar Tsarnaev submits this reply to the government's Supplemental Brief ("Gov't Supp."), and in further support of unresolved Points II and VIII.

As in prior briefing, the government fails to grapple with powerful evidence that Jurors 286 and 138 lied during voir dire on matters that went to the heart of their fitness to serve. Absent from the government's Supplemental Brief is any acknowledgement that Juror 286, the foreperson in a capital trial, failed to disclose having called Tsarnaev a "piece of garbage" on Twitter before voting to sentence him to death. Likewise, the government assiduously avoids mention of Juror 138's false denial that his Facebook friends were not "commenting about this trial," when one had urged him to manipulate the voir dire in order to punish Tsarnaev. The District Court's questions failed to unearth these social media posts or detect the jurors' lies, demonstrating this voir dire's ineffectiveness. The trial judge credited answers (Juror 286's "N/A" and Juror 138's "No") that documentary evidence later proved untrue. By refusing to confront the jurors once their lies came to light, the judge made no in-person determination of impartiality worthy of deference.

The government identifies no authority suggesting, even remotely, that a judge presiding over a capital prosecution—let alone this capital prosecution, tried in a community still suffering the trauma wrought by Tsarnaev's crimes—may look the other way when he learns that jurors have lied about matters like these. This Court allowed trial to proceed in Boston on the premise that voir dire would "expose bias,

1

ignorance, and prevarication." In re Tsarnaev, 780 F.3d 14, 25 (1st Cir. 2015). Because the trial judge did not take the jurors' misconduct seriously, this premise was mistaken. It now falls to this Court to step in and ensure this verdict's integrity.

Instead of tackling these core issues head-on, the government trots out boilerplate language from the Supreme Court's opinion concerning trial judges' discretion over voir dire. But the government concedes, as it must, that the Supreme Court did not consider, much less resolve, Points II and VIII. E.g., Gov't Supp. 3 ("[T]he Supreme Court did not directly consider the unresolved issues."); see also, e.g., Gov't Resp. to May 9, 2022 Order, at 3 (1st Cir. June 8, 2022) ("[T]he Supreme Court's decision did not resolve the four issues left open by this Court."). The Court considered only the Patriarca and Waltham issues. Sup. Ct. R. 14.1(a). And "the language used in an opinion must be read in the light of the issues presented." Sinclair v. United States, 279 U.S. 749, 767 (1929). Moreover, that boilerplate language does not apply to these facts. The jurors' lies compromised voir dire, and the judge unreasonably refused to address that problem, depriving himself of the chance to make an informed credibility assessment to which this Court could defer.

Finally, each of the government's other supplemental authorities is easily distinguishable, as each involves a juror-misconduct claim where the trial judge questioned the affected jurors on the issues raised, thereby satisfying the "unflagging duty" to investigate "colorable" allegations of impropriety. E.g., United States v.

Maldonado-Pena, 4 F.4th 1, 38 (1st Cir. 2021) (cited at Gov't Supp. 15). The government has never offered (and does not now offer) any good reason for the District Court not to have at least asked the jurors about their social media posts, in particular where jury selection remained ongoing and both jurors were present in the courthouse. As this Court has reaffirmed again and again, defendants in Tsarnaev's position are entitled at least to that.

## ARGUMENT

**I.      The District Court's Denial Of Tsarnaev's Cause Challenges To Two Jurors Who Lied During Voir Dire, And The Court's Refusal To Investigate Tsarnaev's Colorable Claim Of Juror Dishonesty, Violated The Fifth, Sixth, And Eighth Amendments.**

As the government concedes (supra p.2), the Supreme Court neither considered nor decided this claim. The opinion's general language pertains only to the Patriarca and Waltham issues, and the Supreme Court did not address the adequacy of the trial judge's investigation into Jurors 286 and 138, much less abrogate this Court's precedents establishing the judge's dereliction of duty. § I.A. Tsarnaev has tendered rock-solid evidence of misconduct that warrants a new penalty phase, or at least a remand. The District Court's rulings, made without questioning the jurors about their social media posts, merit no deference. § I.B.

**A.      The Supreme Court's opinion does not address, and therefore has no relevance to, Tsarnaev's juror-misconduct claim.**

The Supreme Court's opinion won't bear the weight that the government

3

now places on it.  For example, the government's Supplemental Brief says: "[T]he Supreme Court scrutinized the [D]istrict [C]ourt's meticulous jury-selection process in this case, described it in detail, and concluded that it was 'eminently reasonable and wholly consistent with' the Court's precedents."  Gov't Supp. 3 (quoting United States v. Tsarnaev, 142 S. Ct. 1024, 1035 (2022)).  But that statement came during the Supreme Court's discussion of the Patriarca issue, and the opinion nowhere mentions Jurors 286 and 138 or Tsarnaev's proof of their misconduct.  "Only the questions set out in the petition ... will be considered by the Court."  Sup. Ct. R. 14.1(a).  So the language that the government quotes "must be read" in the limited context of the specific "issued presented."  Sinclair, 279 U.S. at 767.  The government has admitted as much in prior briefing.  See Gov't Resp. to May 9, 2022 Order, supra, at 3 ("[T]he Supreme Court's statement that Tsarnaev 'received' a 'fair trial before an impartial jury' is best understood to refer only to those questions presented to that Court." (quoting Tsarnaev, 142 S. Ct. at 1041)).

If anything, the Supreme Court's opinion underscores the importance of the questions that Juror 286 answered falsely. As the opinion makes a point of noting, the questionnaire asked whether prospective jurors "had a personal connection to the bombing" or "had commented or posted online about the bombings." Tsarnaev, 142 S. Ct. at 1032; see also id. at 1035.  The Court chose to spotlight those questions; it follows that honest answers were crucial.  See McDonough

4

Power Equip. v. Greenwood, 464 U.S. 548, 554 (1984) ("The necessity of truthful answers by prospective jurors if [voir dire] is to serve its purpose is obvious.").

Similarly, the government's Supplemental Brief says: "[T]he Supreme Court's emphasis ... on the discretion afforded district courts in managing jury selection applies with full force to the [D]istrict [C]ourt's reasonable determination that Tsarnaev's allegations did not warrant striking the jurors or conducting additional voir dire." Gov't Supp. 13. By restating familiar general principles about trial judges' discretion to superintend voir dire, again in the context of the Patriarca issue, the Supreme Court did not abrogate this Court's precedents imposing an "unflagging duty" to investigate "colorable" claims of juror misconduct. E.g., Maldonado-Pena, 4 F.4th at 38; see also OB.121–22, 148–52; Reply Br. 56–64. Nor did the Supreme Court's undercut its own longstanding recognition that "truthful answers by prospective jurors" are essential to obtain "a fair trial [and] an impartial trier of fact." McDonough, 464 U.S. at 554.

Moreover, the reason that a trial judge receives deference in his rulings on juror qualifications is that such rulings often rest on "his in-person interactions with ... jurors and his observations of their 'inflection, sincerity, demeanor, candor, body language, and apprehension of duty.'" Gov't Supp. 14 (quoting Tsarnaev, 142 S. Ct. at 1034). Here, the District Court denied Tsarnaev's motion to strike Jurors 286 and 138 without confronting the jurors with their social media posts and

5

their lies. The District Court thus did not enjoy the advantage of an "in-person interaction[]" with either. And nothing in the jurors' individual voir dire gave the district court that opportunity. It is now undisputed (but was unknown to the District Court and the parties at the time) that the jurors dissembled in both the voir dire and on the questionnaire, thereby depriving the court of the ability to meaningfully assess their fitness. Consequently, deference is unwarranted, as this Court's precedents hold. See OB.143–44 (collecting cases).

**B.      Tsarnaev is entitled to a new penalty phase, or at a minimum, remand.**

1.      Jurors 286 and 138 gave dishonest responses to material questions about their impartiality, requiring vacatur of the death sentences and remand for a new penalty phase. See Tsarnaev Supplemental Brief ("Tsarnaev Supp.") 3–10.

The government leans heavily on the "deference" due "district court decisions in this area." Gov't Supp. 14. Again, this Court's precedents do not call for deferential review unless "the trial judge has made an appropriate inquiry." United States v. Ramirez-Rivera, 800 F.3d 1, 38 (1st Cir. 2015). Furthermore, the jurors' lies rendered voir dire inadequate and thus undeserving of deference.

Take the simplest example (which the government's Supplemental Brief omits). During voir dire, Juror 138 was asked if any of his Facebook friends were "commenting about this trial." They were. Among others, one friend encouraged the juror to "[p]lay the part so u get on the jury then send him to jail where he will

6

be taken care of." Yet Juror 138 answered: "No." OB.113. That was a lie. But the District Court believed the juror's answer and asked no follow-ups. That credibility assessment was well off the mark. So the Court's impartiality determination—likewise a credibility call, in which the judge decides whether to believe the juror's assurance that he can be fair—can be given no deference either. Juror 138's lie, combined with the trial judge's credulity, deprived the judge and the parties of the opportunity to explore the effect of the juror's friend's presumptively prejudicial comments, and to "observ[e]" the juror's "inflection, sincerity, demeanor, candor, body language, and apprehension of duty" while doing so. Gov't Supp. 14; see Tsarnaev Supp. 20 (quoting United States v. O'Brien, 972 F.2d 12, 14 (1st Cir. 1992)). The additional inquiry that Tsarnaev sought would have given the District Court the chance to undertake a meaningful assessment of credibility and impartiality that would indeed merit deference. Because the District Court failed in that obligation, there is nothing to defer to.

The same analysis applies to Juror 286, who also testified falsely during voir dire, concealing her 22 Twitter posts and presenting a sanitized version of her experience during the lockdown. During the manhunt, did the juror oscillate between fear at her separation from her children and relief upon rejoining them at home, as she posted that day on Twitter? Or did she react to the lockdown only with levity, as she swore during voir dire? It is hard to imagine that a

7

contemporaneous expression of fear during a manhunt for the perpetrator of fatal acts of terrorism, still ongoing at the time of the posts, could be insincere. Moreover, because that fear was an entirely reasonable response to the lockdown, why did the juror feel the need to minimize her experience of the lockdown during voir dire? The District Court's refusal to question her about the discrepancy between her social media posts and her voir dire responses kept the Court and the parties from testing her veracity—and, critically, from determining how her experiences during the lockdown would affect her ability to be unbiased. By refusing to ask the juror to reconcile her divergent accounts, the District Court failed to elicit the information necessary to assess bias. Again, deference to the Court's uninformed ruling is therefore inappropriate. See OB.143–44.

Least persuasive is the government's suggestion that this Court should defer to the trial judge's legal conclusion that the social media posts raised only "'collateral' matters." Gov't Supp. 14 (quoting Add.322). That legal conclusion is entitled to no deference. Nor is the trial judge's interpretation of the posts, which speak for themselves, and which this Court can read and interpret just as well. The posts concern matters with direct bearing on the jurors' impartiality—Juror 286's own Twitter posts mourning the bombing victims, praising the government's law-enforcement witnesses, and condemning Tsarnaev as a "piece of garbage"; Juror 286's own frightening experience during the lockdown; and Juror 138's own

8

Facebook communications in which friends encouraged him to violate his oath. If a juror's real-time experience of the offense she is to adjudicate, her statements of identification with the victims of that offense, and her vitriol for the capital defendant whose life is in her hands concern "collateral" matters, then it's hard to see what would not be collateral. Indeed, the District Court itself confirmed the central importance of these matters by initially asking every juror about their experiences in the lockdown and their exposure to public outrage over the offense.

The government's discussion of this Court's intervening authorities is most conspicuous for what it elides: In all three cases, the trial judges questioned the jurors about the alleged misconduct before deeming the jurors fit. See Gov't Supp. 14–18 (discussing United States v. Kuljko, 1 F.4th 87 (1st Cir. 2021); Maldonado-Pena; and United States v. French, 977 F.3d 114 (1st Cir. 2020 ("French II")).

In Kuljko, the judge "conduct[ed] an individualized voir dire of the juror," "pose[d] an additional question" proffered by the defendant, and a day later, "again questioned" the juror. 1 F.4th at 91–92. In Maldonado-Pena, the judge "brought the juror into the courtroom to explore on the record the juror's connection to the witness," where the judge "question[ed]" the juror at length. 4 F.4th at 41. The next day, the judge "called the juror back for another conversation at the bench," probed "whether [the juror] would give more weight or credibility to [the witness's] testimony" based on their relationship, and "invited further comment

9

from all counsel." Id. Finally, in French II, the judge "responded to the gravity of the defendants' claims of bias with a formal evidentiary hearing—the gold standard for an inquiry into juror misconduct"—at which the parties examined the juror, introduced evidence, and called witnesses. 977 F.3d at 122.

Moreover, as Tsarnaev's Supplemental Brief showed (at 3–10), in assessing whether an honest answer "would have provided a valid basis for a cause challenge," French II considered several factors compelling the conclusion that Jurors 286 and 138 should have been dismissed for cause. Thus, French II examined whether: (i) the experiences which the juror concealed were "her own" experiences or those of others; (ii) there was a connection between the concealed facts and the charged case; (iii) the juror displayed strong emotions; or (iv) the juror lied in order to serve. 977 F.3d at 125, 127. This case checks all those boxes. Rather than engage with French II, the government responds with warmed-over arguments from prior briefing. Gov't Supp. 17–18. Tsarnaev has debunked those points, which depend on strained readings of the record. Reply Br. 35–56.

For example, the government says: "Unlike the questionnaire in French II, the questionnaire in this case did not clearly call for the omitted information" because "Juror 286 easily could have interpreted the term 'this case' to refer to the criminal prosecution, rather than the 2013 Boston Marathon in General." Gov't Supp. 17. That legalistic distinction has never been persuasive (see Reply Br. 35–

38), and is even less so now that the Supreme Court has adopted Tsarnaev's commonsense interpretation of the questionnaire. See Tsarnaev, 142 S. Ct. at 1032 (questionnaire "asked whether the prospective juror had commented or posted online about the bombings"); id. at 1035 ("whether they had ever commented on the bombings in letters, calls, or online posts"). Similarly, the government says: "[T]he district court's question to Juror 138 about whether he had discussed 'the subject matter of this case' did not clearly require him to disclose his Facebook post reporting that he had been called for jury service." Gov't Supp. 17. It did. See Reply Br. 49–51. More important, the government sidesteps the juror's plainest falsehood, which came in response to a direct and unambiguous question from the judge in court—that none of his Facebook friends was "commenting about this trial." Pretending that this lie didn't happen won't make it disappear.

Grasping for some evidence of candor, the government says: "Juror 286 voluntarily disclosed during voir dire that her family was subject to the shelter-in-place order, and Juror 138 voluntarily disclosed comments from family members about his potential service on Tsarnaev's jury." Gov't Supp. 17. As to Juror 286, the government misses the point. What matters is how the lockdown affected the juror. On that score, she not only failed to admit that her experience had been "scary," but affirmatively misled the District Court and the parties by saying that she spent the lockdown "joking" with her boss while at work 20 miles outside

11

Boston.  See Reply. Br. 41–42.  As to Juror 138, the family conversation mentioned during voir dire occurred months before the juror had come to court, when no order prevented him from discussing the case, and no family member had expressed any opinion about the case's merits.  That innocuous disclosure did not substitute for the one that the juror should have made.  See Reply Br. 52.  To the contrary, the fact that the juror volunteered information about a long-ago, unremarkable conversation, while at the same time falsely denying a recent, inflammatory exchange, raises substantial questions about why he admitted the former but not the latter—questions that the District Court refused to explore.  Finally, as Tsarnaev's Supplemental Brief demonstrated (at 7–9), the record contains ample evidence strongly suggesting that Jurors 286 and 138 did indeed "'lie[] to get on the jury.'"  Gov't Supp. 17 (quoting French II, 977 F.3d at 125).

2. The District Court's failure to investigate Tsarnaev's powerful showing of juror misconduct requires vacatur of the death sentences, or at a minimum, remand for further proceedings.  See Tsarnaev Supp. 10–21.

The government has little to add on this point, and still "identifies no case upholding as reasonable an inquiry into juror misconduct in which the trial court did not at least question the implicated juror."  Reply Br. 63.  United States v. Guzman Loera, 24 F.4th 144 (2d Cir. 2022) (discussed at Gov't Supp. 18–19), does not fit that bill and is distinguishable in multiple respects.  For one thing, that

defendant raised his claim post-verdict, when "[c]ourts should be especially 'hesitant to haul jurors in'" for questioning, lest they "'disrupt the finality of the process.'"  Id. at 161.  Tsarnaev raised his claim during jury selection, before the jury had even been sworn, when prospective jurors must expect questioning, and when no competing finality interests exist.  See Tsarnaev Supp. 11.  For another thing, Guzman based his allegation of misconduct on flimsy evidence: "the unsworn, uncorroborated statements that one unidentified juror made to a magazine reporter."  24 F.4th at 161.  Tsarnaev adduced concrete documentary proof of misconduct—the jurors' own social media posts, whose authenticity the government has never disputed, which conflict with the jurors' sworn voir dire testimony.  He raised at least a "colorable" claim.  See Tsarnaev Supp. 11–21.

Most important, the Guzman Loera trial judge had questioned the jurors about the precise prejudicial publicity that was the focus of the defendant's new-trial motion.  "On two separate occasions during the trial, the District Court canvassed the jury and spoke with jurors individually about news articles they had seen," specifically, "an article reporting an affair by Guzman's trial attorney," and "extensive media publicity concerning allegations of Guzman drugging and sexually abusing underage women."  24 F.4th at 161–62.  For that reason, the Second Circuit concluded, the trial judge "did not exceed his discretion by refusing to bring the jury back to court to ask them the same questions again."  Id. at 162.

13

## II. Admission Of The Fruit Of Tsarnaev's Coerced Confession Without A Judicial Determination Of Voluntariness Or An Independent Source Violated The Fifth Amendment

The government says that Tsarnaev waived his Fifth Amendment challenge to the Whole Foods video: "Tsarnaev had all of the information necessary to move to suppress the video as being the 'fruit' of his allegedly involuntary statements, but he failed to raise any challenge to the video until three days *after* the video had been admitted at trial without objection." Govt. Supp. 22. This is doubly wrong.

First, Tsarnaev moved pretrial to suppress "any" use of his coerced confession. See 23.A.10489. If the government derived the Whole Foods video from that confession rather than any independent source, then his pretrial motion preserved the claim. See Fed. R. Crim. P. 12(b)(3) and (c)(3); United States v. Reyes, 24 F.4th 1, 16 n.8 (1st Cir. 2022). Second, when he did not object to the introduction of the Whole Foods video, Tsarnaev was relying on the government's representation that it would not make any use of the hospital confession. It was only when an FBI special agent testified that the source of the video was "information…from a witness" that it became clear, for the first time, that Tsarnaev himself was the "witness," and that the government had broken its promise. 11.A.4704. Tsarnaev immediately objected. Id.; see also 21.A.9726 (renewing objection). Until the agent testified, Tsarnaev did not have "all of the information necessary" to deduce that—contrary to the government's word—the

14

video derived from the confession. He had none of it. His contemporaneous objection, renewed when the connection became apparent, preserved this claim, or established good cause for raising it mid-trial. 11.A.4704.

United States v. O'Neal, 17 F.4th 236 (1st Cir. 2021) (cited at Gov't Supp. 22), supports Tsarnaev. In O'Neal, the government realized an error in one of its search warrant affidavits, and served the defendant with a corrected affidavit prior to trial. Id. at 243. Defense counsel made a tactical decision not to object, choosing to "wait and see what the verdict would be before raising the issue," then moved for a Franks hearing in a post-trial motion. Id. at 243–44. This case is O'Neal's opposite. The government was not candid: After promising not to use the coerced confession pretrial, the government did so without telling the Court or Tsarnaev. And Tsarnaev did not sandbag: He objected as soon as the issue arose.

## CONCLUSION

This Court should:

- For **Point I** (venue), reverse the death sentences;

- For **Point II** (Jurors 286 and 138), reverse the death sentences, or in the alternative, remand for further proceedings;

- For **Point III** (Juror 355), reverse the death sentences; and

- For **Point VIII** (Whole Foods video), remand for further proceedings.

Dated:  October 3, 2022        Respectfully submitted,

/s/ Daniel Habib, Esq.

| | |
|---|---|
| Ginger D. Anders, Esq. | Daniel Habib, Esq. |
| Court of Appeals # 1182436 | Court of Appeals # 1173462 |
| MUNGER, TOLLES & OLSON LLP | Deirdre D. von Dornum, Esq. |
| 601 Massachusetts Ave. NW | Court of Appeals # 11713158 |
| Suite 500E | David Patton, Esq. |
| Washington, DC 20001 | Court of Appeals # 1173507 |
| Tel.: (202) 220-1100 | Mia Eisner-Grynberg, Esq. |
| GINGER.ANDERS@MTO.COM | Court of Appeals # 1186916 |
| | FEDERAL DEFENDERS OF NEW YORK, INC. |
| Cliff Gardner, Esq. | 52 Duane Street, 10th Floor |
| Court of Appeals # 1178109 | New York, NY 10007 |
| LAW OFFICES OF CLIFF GARDNER | (212) 417-8769 |
| 1448 San Pablo Ave. | DANIEL_HABIB@FD.ORG |
| Berkeley, CA 94702 | DEIRDRE_VONDORNUM@FD.ORG |
| (310) 524-1093 | DAVID_PATTON@FD.ORG |
| CASETRIS@AOL.COM | MIA_EISNER-GRYNBERG@FD.ORG |

*Attorneys for Defendant-Appellant*

# CERTIFICATE OF COMPLIANCE

1. This document complies with this Court's order of July 13, 2022 because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains **15** pages.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using **Microsoft Word** in **14-point font** in **Times New Roman** type style.

Dated:  October 3, 2022          /s/ Daniel Habib, Esq.
                                                             Attorney for Defendant-Appellant
                                                             **Dzhokhar Tsarnaev**

---

# CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2022, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system.  I certify that all parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system.

Dated:  October 3, 2022          /s/ Daniel Habib, Esq.
                                                             Attorney for Defendant-Appellant
                                                             **Dzhokhar Tsarnaev**