# United States Court of Appeals
## For the First Circuit

────────────

No. 16-6001

UNITED STATES OF AMERICA,

Appellee,

v.

DZHOKHAR A. TSARNAEV,

Defendant, Appellant.

────────────

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

────────────

Before

Kayatta, Howard, and Thompson,
Circuit Judges.

────────────

Daniel Habib, with whom Deirdre D. von Dornum, David Patton, Mia Eisner-Grynberg, Anthony O'Rourke, Federal Defenders of New York, Inc., Ginger D. Anders, Munger, Tolles & Olson LLP, Clifford Gardner, Gail K. Johnson, and Johnson & Klein, PLLC, were on brief, for appellant.

John Remington Graham on brief for James Fetzer, Ph.D., Mary Maxwell, Ph.D., LL.B., and Cesar Baruja, M.D., amici curiae.

Timothy P. O'Toole, Miller & Chevalier, George H. Kendall, and Squire Patton Boggs (US) LLP on brief for Eight Distinguished Local Citizens, amici curiae.

Michael J. Iacopino, Brennan Lenehan Iacopino & Hickey, David A. Ruhnke, Ruhnke & Barrett, Megan Wall-Wolff, and Benjamin Silverman on brief for National Association of Criminal Defense Lawyers, amicus curiae.

William A. Glaser, Attorney, Appellate Section, Criminal

Division, U.S. Department of Justice, with whom Andrew E. Lelling,
United States Attorney, Nadine Pellegrini, Assistant United States
Attorney, John C. Demers, Assistant Attorney General, National
Security Division, Joseph F. Palmer, Attorney, National Security
Division, Brian A. Benczkowski, Assistant Attorney General, and
Matthew S. Miner, Deputy Assistant Attorney General, were on brief,
for appellee.

———————————

March 21, 2024

———————————

KAYATTA, **Circuit Judge**.  In 2013, Dzhokhar Tsarnaev and his brother detonated two homemade bombs near the finish line of the Boston Marathon, killing three people and injuring hundreds more.  In the ensuing aftermath, the brothers killed a local campus police officer, hijacked a car, and engaged in a shootout with police that injured an officer and resulted in the death of Tsarnaev's brother.  In 2015, a jury sitting in federal district court in Boston convicted Tsarnaev of thirty crimes stemming from the bombings and recommended a death sentence on several of the death-eligible counts.  It did so in two different phases: a guilt phase, in which the jury concluded that Tsarnaev was guilty; and a penalty phase, in which the jury concluded that his sentence should be death.  The district court imposed the death sentence, along with multiple life sentences on the remaining counts.  Tsarnaev appealed to this court, raising sixteen different claims of error in the district court's treatment of his case.

We first considered Tsarnaev's post-verdict appeal in an opinion we issued in 2020.  United States v. Tsarnaev, 968 F.3d 24 (1st Cir. 2020), rev'd, 595 U.S. 302 (2022).  In that opinion, we held that the district court committed three errors: one requiring reversal of three of Tsarnaev's thirty convictions, and two requiring vacatur of Tsarnaev's death sentence and remand for a new penalty-phase proceeding.  Id. at 35, 62, 75.  We emphasized, though, that Tsarnaev "will remain confined to prison for the rest

of his life, with the only question remaining being whether the government will end his life by executing him." Id. at 35.

Because we concluded that a new penalty-phase proceeding was necessary in light of two of Tsarnaev's arguments, there were several arguments that we did not need to conclusively address in our prior opinion.[1] It is common practice in our court -- as it is generally in courts of appeals -- not to resolve issues that need not be resolved if other issues are dispositive. In the words of then-Judge (now Chief Justice) Roberts, "if it is not necessary to decide more, it is necessary not to decide more." PDK Lab'ys Inc. v. U.S. Drug Enf't Admin., 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment).

The Supreme Court, however, reversed our vacatur of Tsarnaev's death sentence on both grounds. United States v. Tsarnaev, 595 U.S. 302, 324 (2022). The Court's opinion was limited to the two issues that we had held required vacatur of Tsarnaev's death sentence. So with respect to the other issues we decided, our prior opinion stands. That leaves for our present review only the remaining arguments that were not resolved in either our prior opinion or the Supreme Court's opinion.

The parties agree that there are four such remaining issues: first, Tsarnaev's claim that he should have been tried

_____

[1] We did address other issues that were likely to resurface on remand. Tsarnaev, 968 F.3d at 42.

- 4 -

somewhere other than Boston; second, his claim that the district court failed to properly address his specific allegations of juror bias with respect to two jurors; third, his claim that the district court erroneously dismissed another prospective juror for his views on the death penalty; and fourth, his claim that the district court erred in its treatment of certain evidence regarding Tsarnaev's post-bombings trip to a Whole Foods store. We address each of these issues in turn. In so doing, we recite only those facts relevant to our resolution of these issues. Our prior opinion contains a more detailed account of the underlying facts.

Ultimately, three of Tsarnaev's four remaining arguments fail. For reasons we will explain, though, his second argument requires further factfinding by the district court. When Tsarnaev presented the district court with plausible claims of juror bias, the court was obliged to investigate those claims. And we conclude that the district court's investigation fell short of what was constitutionally required. This conclusion on its own does not require vacatur of Tsarnaev's death sentence and a new penalty-phase proceeding. Rather, we remand this case to the district court to determine whether either juror should have been stricken for cause on account of bias. If and only if the district court's investigation reveals that either juror should have been stricken for cause on account of bias, Tsarnaev will be entitled to a new penalty-phase proceeding. And even then, we once again emphasize

that the only question in any such proceeding will be whether Tsarnaev will face execution; regardless of the outcome, he will spend the rest of his life in prison.

Our analysis of each of the remaining four issues follows.

## I.

The first remaining issue is Tsarnaev's claim that the district court should not have allowed his trial to proceed in the Eastern Division of the District of Massachusetts (located in Boston). He argues that the community's exposure to the marathon bombings and pre-trial publicity violated his constitutional right to an impartial jury, required a venue change under Federal Rule of Criminal Procedure 21(a),[2] and undercut the reliability of the jury's death verdict. We review the district court's denial of Tsarnaev's venue-change motion for abuse of discretion. United States v. Casellas-Toro, 807 F.3d 380, 385 (1st Cir. 2015).

Although we declined to conclusively decide this issue in our prior opinion, two of us stated that we would likely find no abuse of discretion. Tsarnaev, 968 F.3d at 56. We explained that polling data showed that there were several million people in

---

[2] Federal Rule of Criminal Procedure 21(a) states: "Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."

the venue open to a life sentence even after all the publicity. Id. at 54.  That same data also showed that public awareness of the case and attitudes concerning it in, for example, Western Massachusetts, or even New York City, were not materially different than they were in Boston.  Id. at 55.  In addition, the information contained in the bulk of the pretrial publicity was true and admissible (and uncontested) at trial.  Id.  And that true information painted a picture of conduct that was horrific enough to render any untrue information in the publicity like a match added to a forest fire.  Id.  Precedent, too, leaned against any finding that venue in Boston was precluded as a matter of law. Id. at 55–56.  And Tsarnaev's contention that Boston jurors would view the bombings as an attack of Boston qua Boston overlooked the fact that, as he himself wrote, his intended victim was America; i.e., jurors in any venue in the United States could view the bombings as an attack on their polity.  Id. at 56.

Shifting focus from the general public to the venire pool, Tsarnaev points out that virtually all prospective jurors admitted exposure to some amount of publicity regarding the case, and approximately two-thirds of the venire -- including some seated jurors -- had formed a belief that Tsarnaev was guilty.  But "[p]rominence does not necessarily produce prejudice, and juror impartiality . . . does not require ignorance." Skilling v. United States, 561 U.S. 358, 381 (2010).  As the Supreme Court

said in this very case, "[n]otorious crimes are 'almost, as a matter of necessity, brought to the attention' of those informed citizens who are 'best fitted' for jury duty." Tsarnaev, 595 U.S. at 312 (quoting Reynolds v. United States, 98 U.S. 145, 155–56 (1878)). Nor was the jury partial merely because some jurors had "formed some impression or opinion as to the merits of the case." Irvin v. Dowd, 366 U.S. 717, 722 (1961). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Id. at 723. Here, the seated jurors who had preconceived notions of Tsarnaev's guilt stated that they would be able to do just that. And, with the potential exception of two jurors (discussed in the next section), Tsarnaev gives us no reason to doubt the veracity of the jurors' assurances that they could be impartial.[3] Moreover, Tsarnaev's argument that he was prejudiced by the jurors' preconceived notions of guilt is undermined by his admission of guilt at trial. As we

---

[3] Tsarnaev also points out that five seated jurors had made financial contributions to victims of the bombings, either through direct donations or by purchasing "Boston Strong" merchandise. But we do not find this to be particularly indicative of prejudice against Tsarnaev, and apparently neither did defense counsel because Tsarnaev did not move to strike any of these jurors for cause on this basis. See Beck v. Washington, 369 U.S. 541, 557–58 (1962) ("The fact that petitioner did not challenge for cause any of the jurors so selected is strong evidence that he was convinced the jurors were not biased and had not formed any opinions as to his guilt.").

noted previously, Tsarnaev "does not say he would have raised an innocence defense in another venue." Tsarnaev, 968 F.3d at 55.

Tsarnaev's similar argument that the venire's pretrial exposure to victim-impact publicity undercuts the reliability of his death sentence also falls short.  Despite exposure to the publicity, fewer than half of the prospective jurors who believed Tsarnaev was guilty -- and none of the seated jurors -- said they had formed an opinion that Tsarnaev should die.

Finally, Tsarnaev asserts that the length of the jury selection process -- twenty-one court days of individual voir dire -- casts doubt on the jurors' assurances of impartiality. See Murphy v. Florida, 421 U.S. 794, 802-03 (1975) ("The length to which the trial court must go in order to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of impartiality.").  But, as this court previously observed, a jury selection process of this length is "not unusual," particularly in a high-profile case.  In re Tsarnaev, 780 F.3d 14, 26 (1st Cir. 2015); see id. at 26 n.14 (collecting cases).  Following the Supreme Court, we hold that the district court's jury selection process -- with the important caveat concerning its application discussed in the next section -- was "eminently reasonable." Tsarnaev, 595 U.S. at 315.

For all of these reasons, as more fully explained in our court's most recent prior opinion in this case, id. at 54-56, we

conclude that the district court did not abuse its discretion in denying Tsarnaev's motion to change venue.

## II.

The second remaining issue is Tsarnaev's contention that the district court failed to investigate his plausible claims of juror bias relating to two prospective jurors who ultimately ended up on the jury that recommended the death sentence.  After the district court provisionally qualified Jurors 138 and 286, but before the parties exercised their peremptory strikes, Tsarnaev's counsel discovered postings on those jurors' social media pages regarding the bombings and the district court proceedings. Tsarnaev's counsel moved to strike the jurors for cause.  In the alternative, his counsel asked that the district court permit further questioning of the jurors in light of the discovery of their social media postings.  The district court denied these requests.  In so doing, it did not adequately explore Tsarnaev's claims of juror bias.  We therefore remand to the district court to conduct such an investigation.  Our reasoning follows.

### A.

### 1.

On January 5, 2015, Juror 138 posted on his Facebook page that he was at the federal courthouse for jury duty.  At that time, the court had not yet instructed potential jurors regarding

any restrictions on their social media use.  As of 8:18 a.m.,
Juror 138's relevant Facebook entries read as follows:

> JUROR 138: Jury duty....this should be
> interesting...couple thousand people already
> here
> FRIEND 1: How'd you get stuck going to
> Boston?
> FRIEND 2: Did you get picked for the
> marathon bomber trial!!!???  That's awesome!
> JUROR 138: Ya awesome alright haha
> there's like 1000s of people
> FRIEND 3: If you're really on jury duty,
> this guys got no shot in hell.
> FRIEND 4: OMG you could be on this
> jury!!!
> FRIEND 4: 1200 people it's one out of 100
> chance

At 9:15 a.m., the district court addressed the potential
jurors, including Juror 138.  As part of its remarks, it instructed
the potential jurors as follows:

> Thank you, all.
> Although you have only heard briefly
> about this case this morning, and indeed have
> heard no evidence yet about it, it is
> extremely important until further notice that
> you do not discuss this case among yourselves
> or with anyone else.  That is because, as I've
> said, a jury's verdict must be based on the
> evidence produced at trial and must be free
> from outside influence.  Therefore, I now
> order each of you not to discuss this case
> with your family, friends or any other person
> until I either excuse you, or if you are
> selected as a juror, until the trial
> concludes.  This is a court order, willful
> violation of which may be punishable as a
> contempt of court or otherwise.
> You may tell others that you may be a
> juror in the case, and you may discuss the
> schedule with your family and employer because

those people are entitled to know when you might not be available; however, you are not to discuss anything else, or allow anyone to discuss with you anything else until you have been excused, or if you're a juror, until the case concludes.

This means, among other things, you may not speak to any member of the news media about the case. There is legitimate public interest in this matter, and the news media play a vital role in informing the public about it. It would, however, be improper for you to discuss this case or your role in it with them.

If anyone should ask to speak to you about the case, you should politely decline. If anyone persists, please inform the jury clerk or other court staff promptly.

I also instruct you from here on not to read, watch or listen to any reports about the case in the media until you are either excused, or if you're selected as a juror, until the case concludes. If you should, by chance, encounter a news story in the newspaper, on the radio or television or on the internet, please turn the page, change the channel or close the screen. Do not read, listen to or watch anything related to the case, and do not under any circumstances do any online research about the case, of anything or anyone who may be connected with it. This includes Googling or otherwise researching the defendant, any of the witnesses or events involved, or any of the trial participants such as the lawyers or even the judge.

Likewise, you must not communicate about this case or allow anyone to communicate about it with you by phone, text message, Skype, email, social media, such as Twitter or Facebook. Please do not discuss this case or anything I have just said with any of the other potential jurors or anybody else here today.

Juror 138, like the other potential jurors, then received a written questionnaire, which contained the following additional instructions:

> You will be permitted to leave for the day when you have completed the questionnaire. Do not discuss any of the <u>questions</u> or your <u>answers</u> on this questionnaire with anyone, including members of your family, co-workers, or other potential jurors. If anyone approaches you and attempts to discuss any aspect of this questionnaire, the jury selection process, or any aspect of this case, you may not answer their questions or engage in any discussion.
> Do not discuss anything about this case with anyone and do not read, listen to, or watch anything relating to this case until you have been excused as a potential juror, or if you are selected as a juror, until the trial is over. You may not discuss this case or allow yourself to be exposed to any discussions of this case in any manner.

The questionnaire posed one hundred questions to be answered by the potential jurors under pains and penalties of perjury. In response to two questions, Juror 138 reported that he used the Facebook social media platform. Asked "[i]f you have commented on this case in a letter to the editor, in an online comment or post, or on a radio talk show, please describe," he answered "N/A."

By 10:11 a.m., Juror 138 had received (but did not then respond to) two more comments from his friends:

> FRIEND 5: They're gonna take one look at you and tell you to beat it

> FRIEND 6: Did you get selected?

At 1:14 p.m. that same day, Juror 138 reentered the
discussion on the thread of his earlier post, as follows:

> JUROR 138: There's 1200 or so of us...250
> a day mon-fri this week go in full out survey
> 100's of ques and then we call back to see
> when we go back and they select 18 of us out
> of the 1200 but single people out one by one
> over the next month they are telling me the
> process will take until the 23rd or
> 24th...then the whole trial it self is going
> to be 3-4 months they say
> JUROR 138: Shud be crazy he was legit
> like ten feet infront of me today with his 5
> or 6 team of lawyers...can't say much else
> about it tho...that's against the rules
> FRIEND 7: Whoa!!
> FRIEND 3: Since when does [Juror 138]
> care about rules?
> FRIEND 8: Play the part so u get on the
> jury then send him to jail where he will be
> taken care of
> JUROR 138: When the Feds are involved id
> rather not take my chances...them locals
> tho...pishhh ain't no thaang
> FRIEND 9: Yea super careful bc should you
> get picked any mention of anything can get you
> booted or call for mistrial..

Eighteen days later, not having yet seen any of the
foregoing Facebook exchanges, the court and counsel questioned
Juror 138 under oath. The court began by asking whether Juror 138
had followed the court's instructions regarding communication
about the case, to which the juror responded that he had:

> THE COURT: Good. When you left last time
> you were here, I had instructed everyone to
> avoid any discussion of the subject matter of
> the case with anybody. You could talk about
> coming here, obviously, but -- and also to

avoid any exposure to media articles about the
case.

> Have you been able to do that?
> [JUROR 138]: Yeah, I haven't looked at
> anything.
> THE COURT: Keep your voice up so everyone
> can hear you.
> [JUROR 138]: Yeah. No, I haven't talked
> to anybody about it.

The court inquired into Juror 138's use of Facebook as follows:

> THE COURT: Let me ask -- we asked you a
> little bit about social media, and you said
> you use Facebook?
> [JUROR 138]: Yes.
> THE COURT: I guess you post to it once or
> twice a week but you check it every day or
> something like that?
> [JUROR 138]: Yeah. We drive around in
> the city truck. If I'm not driving, I'm
> sitting in the passenger seat just playing on
> my phone unless we're working. But other than
> that, I don't really -- I'm not posting on it
> or talking to people on it.
> THE COURT: What's the nature of your use
> of it? Is it essentially personal, social-
> type things?
> [JUROR 138]: Yeah.
> THE COURT: Do you comment on public
> affairs or anything like that?
> [JUROR 138]: Yeah, I see what my friends
> are doing and comment on that.
> THE COURT: Anybody commenting about this
> trial?
> [JUROR 138]: No.

(emphasis added).

Having been thus assured that Juror 138 had followed the
court's instructions and had not seen any Facebook comments about
the trial, no counsel objected to Juror 138. The court thereafter

placed him on its list of seventy-five provisionally qualified jurors from which the actual jury of twelve jurors and six alternates would be selected.[4]

After Juror 138 was provisionally qualified, defense counsel obtained the social media postings of some potential jurors, including Juror 138.  On February 27, which the defense described as "within days" of uncovering the social media posts, the defense moved to excuse Juror 138 for cause.  Defense counsel pointed out that after being ordered not to "communicate about this case or allow anyone to communicate about it with you by . . . Facebook," and not to "discuss anything about this case with anyone," Juror 138 promptly returned to Facebook to continue his communications with his friends about the case.  And, defense counsel complained, some of the comments by Juror 138's friends were particularly suggestive of bias and could potentially influence Juror 138's actions during the case (e.g., "If you're really on jury duty, this guys got no shot in hell"; and "Play the part so u get on the jury then send him to jail where he will be taken care of").  More significantly, Juror 138 assured the court that he had not talked to anyone about the case, and when asked whether anyone had commented "about this trial" on Facebook, he

---

[4] The district court ended up excusing five of these jurors for hardship, leaving a group of seventy provisionally qualified jurors.

responded "No."  Defense counsel argued that Juror 138's violation of the court's instructions, potential bias, and dishonesty during questioning warranted excusing him for cause.  After the government filed an opposition, defense counsel requested further questioning of Juror 138 as an alternative remedy.

The district court addressed the defense's motion (along with other motions to excuse jurors for cause) from the bench on the morning of March 3, 2015, the day the parties were to exercise their peremptory strikes.  Juror 138 and the other provisionally qualified jurors were in the courthouse that day.  Nevertheless, the district court denied the defense's motion without bringing Juror 138 in for further questioning.  It gave two reasons: first, the defense should have raised its objection when voir dire was being conducted; and second, the objection was speculative.  We review the district court's decision for abuse of discretion.[5] United States v. Zimny, 846 F.3d 458, 464 (1st Cir. 2017).

---

[5]  The government argues that we should review the district court's decision not to permit further questioning of Juror 138 for plain error, because Tsarnaev failed to preserve his request for further questioning by not requesting it as an alternative remedy in his initial motion.  But in his reply to the government's opposition to his motions to excuse jurors for cause, Tsarnaev requested further questioning as an alternative remedy for all jurors that he had moved to excuse (including Juror 138).  And the district court considered and rejected this request with regard to all such jurors, without suggesting that Tsarnaev had waived this request with regard to Juror 138.  So we consider the issue preserved on appeal.

**2.**

As to the timeliness of the defense's motion, the district court required too much of defense counsel. Between January 5 and 7, 2015, a total of 1,373 jurors showed up at the courthouse and filled out questionnaires. The parties ruled out some of those jurors based on their questionnaires alone, but hundreds remained eligible for further narrowing through individual voir dire. The court and the parties began that process on January 15, individually questioning 256 prospective jurors over the course of twenty-one court days. The process continued until February 25, when the court had provisionally qualified seventy-five prospective jurors from which the final panel would be selected. And in addition to reviewing over one thousand questionnaires and preparing for and conducting hundreds of individual voir dire sessions, the defense was busy reviewing discovery productions and trial exhibits, litigating pre-trial motions, and otherwise preparing for trial in a high-profile capital case.

Importantly, defense counsel brought the Facebook posts to the court's attention in time for the court to investigate and take any necessary corrective action before empaneling the jury. See United States v. Appolon, 695 F.3d 44, 65 n.10 (1st Cir. 2012) (holding that an objection was timely because it was made when "the district court could have taken any necessary corrective

action").  The defense filed its motion to excuse Juror 138 just two days after the end of individual voir dire -- before the parties exercised peremptory strikes, and while there was a list of seventy-five provisionally qualified jurors from which to select twelve jurors and six alternates.  So the district court could have brought Juror 138 in for further questioning before empaneling the jury and, if that questioning revealed bias, simply removed him from the list of provisionally qualified jurors.

This would have been especially easy to do during the morning of March 3, when Juror 138 and the other provisionally qualified jurors were present in the courthouse.  Indeed, the previous day, the court had suggested calling into the courthouse for voir dire on the morning of March 3 a prospective juror whose voir dire had been skipped and who had not been provisionally qualified, with the possibility of inserting him into the list of provisionally qualified jurors.[6]  Ushering Juror 138 into the courtroom that same morning for supplemental questioning would certainly have been far less burdensome than conducting an entire voir dire of the prospective juror who had been skipped.

In these circumstances involving over one thousand potential jurors of whom hundreds were selected for voir dire in a death penalty case, we do not think it reasonable to require

---

[6]  The proposed make-up voir dire did not occur because the parties agreed to treat the juror as effectively excused.

defense counsel to thoroughly investigate each prospective juror's social media prior to voir dire where, as here, the juror's questionnaire responses indicate that the juror has not commented about this case online. Cf. Williams v. Taylor, 529 U.S. 420, 443 (2000) (when juror was silent in response to questions about relations to witnesses, defense counsel did not fail to act diligently by not checking public records that would have revealed her former marriage to a government witness); see United States v. French, 904 F.3d 111, 118 (1st Cir. 2018) ("French I") (rejecting waiver argument where, taking a juror's questionnaire response "according to its most customary meaning, there was no reason to ask any follow-up" at voir dire). So although it is of course possible that defense counsel could have discovered Juror 138's Facebook posts in the eighteen days between January 5 (when the posts were made) and January 23 (when Juror 138 appeared for individual voir dire), we think counsel acted diligently under the circumstances. See id. at 120 (stating that filing a motion "approximately one month" after learning of a juror's possible dishonesty during jury selection, "while in the midst of preparing for sentencing," constituted "sufficient diligence").

Finally, the government does not point to any advantage that Tsarnaev gained by filing his motion after the end of individual voir dire but before peremptory strikes, nor is one obvious to us. For all these reasons, in the circumstances of

this case, we conclude that the timing of the discovery of the juror's Facebook postings did not obviate the need to determine whether the juror could fairly adjudicate whether Tsarnaev should be put to death.

**3.**

We turn next to the merits.  We agree with the government's summary in its brief of the rule of law that applies to claims of juror misconduct:  "[W]here a defendant makes a colorable or plausible claim of juror misconduct, the district court must investigate it."  Gov. Br. at 133 (quoting Zimny, 846 F.3d at 464).

We therefore conduct our inquiry in two steps.  First, we ask whether Juror 138's Facebook exchanges or his voir dire responses raised a colorable or plausible claim of actual bias incompatible with sitting as a fair juror in Tsarnaev's trial.  Second, because we answer the first question yes, we ask whether the district court conducted an adequate investigation before allowing Juror 138 to sit on the jury charged with deciding whether Tsarnaev lives or dies.  In both instances, our review is for abuse of discretion.  Zimny, 846 F.3d at 464.

**a.**

The district court never in so many words determined whether Tsarnaev's evidence raised at least a colorable or

plausible claim of juror bias.  The court did, however, label the claim "largely speculative," explaining:

> There are various possible explanations and none of them is, in my view, serious enough to warrant changing our provisional qualification, and in particular, none of the issues that were raised seem to me to suggest the presence of a bias that would be harmful to jury impartiality in this case.  They're collateral matters about things, they are -- people close to them may have done, but none of them speak to actual bias in the case.[7]

The court based this conclusion on its review of the Facebook posts, Juror 138's jury questionnaire, and Juror 138's voir dire transcript.

Our disagreement with the district court's conclusion begins with the nature of the Facebook comments.  One friend of Juror 138 believed that with Juror 138 on the jury, Tsarnaev would have "no shot in hell."  And another advised Juror 138 to "[p]lay the part so u get on the jury then send him to jail where he will be taken care of."  Taken at face value, these comments certainly can be read as suggesting that people who knew Juror 138 viewed him as biased.  If Juror 138's friends were to be believed that Juror 138 would give Tsarnaev "no shot in hell" and that he would lie to get on the jury and send Tsarnaev to jail to "be taken care of," then Juror 138 was not the type of "fair impartial jur[or]"

---

[7] The district court gave this general explanation with respect to Tsarnaev's motions to strike Juror 138, Juror 286, and several other prospective jurors not at issue in this appeal.

that the Constitution requires.  <u>Press-Enter. Co.</u> v. <u>Superior Ct.</u>
<u>of Cal.</u>, 464 U.S. 501, 510 n.9 (1984).

That being said, the district court was not required to
take the comments of the juror's friends at face value.  Social
network exchanges are notoriously opinionated and often designed
primarily for attention, humor, and other such aims.  The comments
themselves do not mean that they were accurate descriptions of
Juror 138, or that he would follow his friends' advice.  Most
people in the United States in 2015 likely had friends who felt
that Tsarnaev should be put in jail to be "taken care of," and
many likely felt that his actions warranted a death penalty.  It
is certainly not established that Juror 138 ascribed to that view,
or that he could not put aside his friends' suggestions just as he
might put aside his own preconceptions.  Moreover, the exchange
here shows that Juror 138 was willing to remind his friends that
he needed to follow the rules.  So, if he had disclosed his Facebook
exchanges about the trial, the district court would have been well
within bounds to find him unburdened by any predisposed bias, with
no need for further questioning.

The crucial problem with the district court's analysis
has less to do with the substance of the friends' comments than
with the juror's subsequent flat-out denial that any of his
Facebook friends was "commenting about this trial" when they told
him to play the part to get on the jury, avoid a mistrial, and

send Tsarnaev to be taken care of.  The government suggests that
it is not clear that the juror's denial was false because the juror
may have not construed his friends' comments as being "about this
trial."  Gov. Br. at 129.  This reading is a stretch.  The Facebook
friend's encouragement to "send [Tsarnaev] to jail" bears directly
on the jury's core function of determining guilt.  It would strain
common sense and ordinary understanding to declare that the jury's
determination of guilt -- the very purpose of a trial in a criminal
case -- is not an aspect of the "trial" covered by the district
court's question.  More importantly, Tsarnaev "need not show at
the outset that [his] claim is so strong as to render contrary
conclusions implausible."  French I, 904 F.3d at 117.  All that
matters preliminarily is whether Tsarnaev's reading is plausible.
See id. (rejecting argument that alternative, benign explanations
for an apparent discrepancy negated the need for an investigation
because "[e]ach hypothesis is plausible, but insufficiently likely
so as to warrant rejecting without investigation the claim of juror
misconduct as improbable").  The government does not contend that
it is implausible to interpret Juror 138's voir dire answer as
inconsistent with the evidence of the Facebook comments.  Nor does
the government dispute that Juror 138's exposure to his friends'
Facebook comments about the trial was material, and it was
unquestionably so.  "Due process requires that the accused receive
a trial by an impartial jury free from outside influences."

Sheppard v. Maxwell, 384 U.S. 333, 362 (1966).  That is why the district court instructed the jurors to avoid any media exposure or communication with others about the case, and consistently asked in individual voir dire whether they had complied with this instruction.

Of course, an apparent discrepancy in a juror's answer does not by itself prove dishonesty.  The juror may have misunderstood the inquiry, thought the posts did not concern the trial, or forgotten the posts.  Jurors are ordinarily not lawyers; the whole process can be a bit of a mystery to them, and there is no basis to assume that they are all careful wordsmiths who might parse comments and inquiries like we do.  See McDonough Power Equip. v. Greenwood, 464 U.S. 548, 555 (1984) ("[J]urors are not necessarily experts in English usage.  Called as they are from all walks of life, many may be uncertain as to the meaning of terms which are relatively easily understood by lawyers and judges.").  If the discrepancy was the result of anything other than dishonesty, we would find no abuse of discretion in the district court's treatment of Juror 138.

The problem is that we cannot know the reason for the discrepancy because no one asked Juror 138 for an explanation.  And it is plausible -- given Juror 138's engagement with his friends' Facebook comments that many people would consider to be about "this trial" -- that the juror's answer to the court's

question was knowingly dishonest.  If that were so, Juror 138's
dishonesty would be a powerful indication of bias.  See, e.g., id.
at 556; French I, 904 F.3d at 116–18; Sampson v. United States,
724 F.3d 150, 167 (1st Cir. 2013).  For that reason, we reject as
clearly unsupported the district court's conclusion that no
possible explanations for the discrepancy are serious.  It is one
thing to have friends who say how to decide a case.  It is quite
another to engage in communication about the case after being
instructed not to do so, and then feel compelled to cover up those
communications when asked point-blank by the court.  See, e.g.,
United States v. Boney, 977 F.2d 624, 634 (D.C. Cir. 1992)
("[L]ying or failing to disclose relevant information during voir
dire itself raises substantial questions about the juror's
possible bias."); Burton v. Johnson, 948 F.2d 1150, 1159 (10th
Cir. 1991) (stating that a juror's "dishonesty, of itself, is
evidence of bias"); United States v. Colombo, 869 F.2d 149, 151–
52 (2d Cir. 1989) (explaining that knowing dishonesty during voir
dire is a powerful indicator of bias because it strongly suggests
partiality); United States v. Perkins, 748 F.2d 1519, 1532 (11th
Cir. 1984) (observing that a juror's "dishonesty, in and of itself,
is a strong indication that he was not impartial").  Even the
government acknowledges that "in most cases, the honesty or
dishonesty of a juror's response is the best initial indicator of
whether the juror in fact was impartial." Gov. Br. at 120 (quoting

with approval McDonough, 464 U.S. at 556 (Blackmun, J., concurring)).

The government argues that we can tell now without any further inquiry that Juror 138 was not being knowingly dishonest, because he disclosed that some of his relatives told him at Thanksgiving that they were jealous of his jury duty and others wished him good luck.  The government posits that if Juror 138 were trying to hide others' comments in order to get on the jury, he would not have disclosed those communications.  But mere expressions of jealousy and good luck strike us -- as we expect they may well have struck Juror 138 -- as far less indicative of potential bias than comments that Tsarnaev has "no shot in hell" if Juror 138 serves on the jury and that Juror 138 should "[p]lay the part so u get on the jury then send him to jail where he will be taken care of."  We therefore think it at least plausible that Juror 138 thought that disclosing his relatives' comments at Thanksgiving would not significantly hurt his chances of being selected, but disclosing the Facebook exchanges might.  Moreover, Juror 138 disclosed the Thanksgiving comments on the questionnaire before his friends encouraged him to "[p]lay the part" to get on the jury and warned him to be "super careful bc should you get picked any mention of anything can get you booted or call for mistrial."  So Juror 138's disclosure of his relatives' Thanksgiving comments does not render it implausible that he

intentionally hid his friends' subsequent Facebook comments in order to get on the jury.

Given the substance of the Facebook exchange and the apparently direct inconsistency between Juror 138's voir dire answers and his actual conduct, the record provides colorable support for the claim that a biased juror employed dishonesty to make his way onto the jury. See also Clark v. United States, 289 U.S. 1, 10 (1933) (observing that a juror's bias can be "gathered from the disingenuous concealment which kept her in the box"); Colombo, 869 F.2d at 151-52 ("[I]f . . . the juror's motive in lying on the voir dire was precisely to prevent . . . her dismissal from the case[,] . . . [i]t [would] reflect[] an impermissible partiality on the juror's part.").

### b.

Having held that Tsarnaev raised a colorable claim of juror misconduct, we now assess whether the district court adequately investigated that claim. The district court's duty to investigate colorable claims of juror misconduct is "unflagging." Zimny, 846 F.3d at 464 (quoting United States v. Paniagua-Ramos, 251 F.3d 242, 250 (1st Cir. 2001)); see Dennis v. United States, 339 U.S. 162, 168 (1950) ("[W]hile impaneling a jury the trial court has a serious duty to determine the question of actual bias . . . ."). As the Supreme Court explained in this very case, "the district court's duty is to conduct a thorough jury-selection

process that allows the judge to evaluate whether each prospective juror is 'to be believed when he says he has not formed an opinion about the case.'" Tsarnaev, 595 U.S. at 313 (quoting Mu'Min v. Virginia, 500 U.S. 415, 425 (1991)).

Faced with a plausible claim of juror misconduct, the district court's "primary obligation [was] to fashion a responsible procedure for ascertaining whether misconduct actually occurred and if so, whether it was prejudicial." Zimny, 846 F.3d at 465 (quoting United States v. Rodriguez, 675 F.3d 48, 58 (1st Cir. 2012)). The district court "has broad discretion to determine the type of investigation which must be mounted." Id. (quoting Rodriguez, 675 F.3d at 58). "Notwithstanding this broad discretion, however, a district court 'judge does not have discretion to refuse to conduct any inquiry at all regarding the magnitude of the taint-producing event and the extent of the resulting prejudice' if confronted with a colorable claim of juror misconduct." Id. (quoting United States v. Lara-Ramirez, 519 F.3d 76, 87 (1st Cir. 2008)). "[I]t is the circumstances of each case that will determine the level of inquiry necessary." Id. (quoting Rodriguez, 675 F.3d at 61).

The inadequacy of the district court's investigation in this case follows inescapably from our previous discussion centering on the importance of learning the reason for Juror 138's inaccurate voir dire answer. The Supreme Court has emphasized the

importance of a juror's "motives for concealing information" in exploring a claim of juror bias.  McDonough, 464 U.S. at 556; see id. (Blackmun, J., concurring) (agreeing with the majority that, "in most cases, the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial"); id. at 558 (Brennan, J., concurring in the judgment) (stating that "whether an inaccurate answer was inadvertent or intentional" is a "factor[] to be considered" in determining juror bias).

In line with this guidance from the Supreme Court, our circuit precedent requires that to rule adequately on a claim of juror bias premised on dishonest voir dire responses, the district court must consider both "the information that the dishonest juror failed to disclose and the reason behind the juror's dishonesty." French I, 904 F.3d at 116 (emphasis in original) (quoting Sampson, 724 F.3d at 165)).  That is because "[a]lthough juror dishonesty, by itself, is not sufficient to demonstrate bias, it can be a powerful indicator of bias."  Sampson, 724 F.3d at 167.  This understanding accords with the Supreme Court's instruction in McDonough as well as case law from other circuits that we have already cited, above.

In rejecting Tsarnaev's allegation that Juror 138 lied under oath in order to get on the jury to do what his friends urged, the district court did not claim to have relied on its prior

face-to-face impressions of Juror 138.  Nor would it be reasonable to infer that the court did so.  Juror 138 (whose individual voir dire was on January 23, 2015) was just one of 256 prospective jurors questioned over the course of 41 days, from January 15 through February 25.  Rather, the district court relied solely on its review of the Facebook comments, the questionnaire answers, and the voir dire transcript.  All that reading could have done is confirm what was asked, what was answered, and what the Facebook exchanges were.  As we have already explained, not even the government argues that those writings cannot plausibly be read as materially inconsistent.  Nor is this a case in which the very nature of an apparently dishonest answer inexorably points to an explanation other than juror bias.

So while the reading of the record undertaken by the district court could have revealed the questions to be addressed in an investigation (for example, did Juror 138 mislead the court intentionally and, if so, why?), nothing in that reading could have answered the necessary inquiry.  Indeed, precisely because the court was unaware of the Facebook exchange when the voir dire occurred, it quite obviously could not have undertaken the pertinent inquiry, much less formed an opinion concerning the answer to that inquiry.  As we have explained previously, "we do not see how a court can say whether the juror in this instance was unduly biased without knowing why [he] answered as [he] did."

French I, 904 F.3d at 118.  In the words of the Eighth Circuit, "the court should have questioned the juror to find out 'his reasons for holding back . . . his pertinent information.'" United States v. Tucker, 137 F.3d 1016, 1028 (8th Cir. 1998) (quoting United States v. St. Clair, 855 F.2d 518, 523 (8th Cir. 1988)); see also Green v. White, 232 F.3d 671, 676 (9th Cir. 2000) (finding that it was error for the district court to conclude that juror's false statements were unintentional without inquiring whether juror's motivations for lying were benign).

We therefore hold that the district court exceeded the scope of its discretion by deciding not to pose any further questions to Juror 138 after being confronted before the jury was empaneled with a plausible claim of juror misconduct.  In the circumstances presented here, more needed to be known before concluding that Juror 138 could determine Tsarnaev's fate.  The right to an impartial jury is a "constitutional bedrock." Sampson, 724 F.3d at 163.  And "the concern for an impartial jury is certainly at its highest when a defendant's life is on the line." French I, 904 F.3d at 120.  Voir dire examination of jurors "serves to protect that right by exposing possible biases, both known and unknown, on the part of potential jurors." McDonough, 464 U.S. at 554.  As the Supreme Court has explained, "[t]he necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious." Id.  So when there is a plausible claim

that a prospective juror lied in a manner that may reveal bias, a court need conduct some inquiry reasonably calculated to determine whether the prospective juror did lie and, if so, why.

### B.

### 1.

We consider next the challenge to Juror 286. On the day of the marathon bombings and in the days after, Juror 286 made a series of posts on Twitter related to the bombings and the aftermath. On April 15, 2013, the day of the bombings, Juror 286 made the following "tweets" and "retweets":[8]

- She retweeted: "Twitter is great source of info during a crisis. Only downside is accuracy suffers in quest to be first. #prayforboston"

- She retweeted: "BOSTON: POLICE AND FBI URGING ANYONE WITH VIDEO OF THE FINISH LINE AT THE TIME OF THE EXPLOSION SHOULD PLEASE COME FORWARD. RETWEET."

- She tweeted: "Need something to make you smile and warm your heart after today's tragedy at #BostonMarathon , take a look at #BostonHelp"

---

[8]  A "tweet" is an original Twitter post by the user.  A "retweet" is a reposting of another user's Twitter post.

- She tweeted: "Little 8yr old boy that was killed at marathon, was a Savin Hill little leaguer :-( RIP little man #Dorchester #bostonmarathon"

- She retweeted: "Please be patient & polite to officers who will be doing extra security checks in #Boston. They're trying to keep us all safe."

The next day, Juror 286 made the following posts on Twitter:

- She retweeted: "1st-year #Patriots WR @DannyAmendola pledges to donate $100 for each '13 reception to Boston Marathon Relief Fund & $200 for each drop."

- She retweeted: "The forgotten heroes of the day are the surgeons doing nonstop surgery all day at some of the best hospitals in the world. Saving many lives"

- She retweeted: "A sad day but a day where training, pre-planning, unified command and a quick first response by many saved lives. Thanks to All"

On April 19, 2013, the day of the lockdown and the search for Tsarnaev, Juror 286 made the following posts on Twitter:

- She tweeted: "They must've got some blood test back and know this kid is just bleeding to death somewhere #bostonbombing"

- She tweeted: "it's worse having to work knowing ur family is locked down at home!! Finally home locked down w/them #boston"

- She tweeted: "Love this!!!" with a photo depicting the phrase "Boston Strong."

That same day, presumably after Tsarnaev was caught, Juror 286 made the following posts on Twitter:

- She retweeted: "Monday started in celebration and ended in tragedy. Today began in tragedy and ended in celebration. You can't keep us down. #BostonStrong"

- She retweeted: "Sleep tight #Boston! #Bostonyou'remyhome"

- She retweeted: "Congratulations to all of the law enforcement professionals who worked so hard and went through hell to bring in that piece of garbage."

- She retweeted: "Told y'all. Welcome To Boston The City Of CHAMPS! We get our shit DONE! #BostonStrong

#617," with this text followed by a string of emojis.

On April 20, 2013, Juror 286 made the following posts on Twitter:

- She retweeted: "I love this! The duckling statues in the Public Garden all have signs saying, 'Boston Strong' w/ race numbers 'Qck,'" with a photo of a duckling statue with such a sign.

- She retweeted: "Officer Donohue and Officer Collier... Graduation day at the MBTA Police Academy. Please keep both in your prayers," with a photo of the two officers.

In the years between the bombings and the trial, Juror 286 occasionally made more Twitter posts related to the bombings:

- On October 13, 2013, she retweeted: "Marathon bombing victim Jane Richard sang the national anthem with other children from St. Ann's Parish at Fenway," with an accompanying photo.

- That same day, she retweeted: "I can't believe little Jane Richard sang the National Anthem at the @RedSox game and we didn't get to see it! Ugh! #BostonStrong"

- On April 29, 2014, she retweeted: "#BostonStrong: Henry Richard, Martin's older brother, seen running strong in today's BAA Youth 2014 Relay Races," with an accompanying photo.

On January 5, 2015, Juror 286 showed up at the courthouse and completed her juror questionnaire. She disclosed that she used Facebook, Instagram, and Twitter. In response to the question asking "[i]f you have commented on this case in a letter to the editor, in an online comment or post, or on a radio talk show, please describe," she answered "don't believe I have."

Another question asked, "If you or, to the best of your knowledge, a family member, or close friend were <u>personally</u> affected by the Boston Marathon bombings or any of the crimes charged in this case (including being asked to 'shelter in place' on April 19, 2013), please explain." She answered "N/A."

Juror 286's questionnaire answers also revealed that she had two children and that she was born and raised in Dorchester, a neighborhood in Boston, Massachusetts, where she had lived for the past forty-two years.

Juror 286 appeared for individual voir dire on February 4, 2015. Regarding her social media use, Juror 286 stated as follows:

> THE COURT: We asked a little bit about social media you use. You use what? Facebook?

> [JUROR 286]:        Facebook,        Twitter,
> Instagram.
> THE COURT: Mostly for family or social?
> [JUROR 286]:     Yeah,     just     social.
> Facebook,  I  keep  up  with  friends  and
> relatives.   Twitter, I watch TV and kind of
> tweet while I'm watching TV with other people
> that are watching the same programs that I'm
> watching.
> THE    COURT:    Does    that    include    news
> programs?
> [JUROR 286]: No.

During  questioning  by  defense  counsel,  the  following

exchange occurred:

> [DEFENSE   COUNSEL]:   Okay.    At   the
> restaurant,  did  your  employees  or  coworkers,
> colleagues,  talk  about  the  Boston  Marathon
> bombing when it happened?
> [JUROR 286]: No.  I work 20 miles out of
> the city. We were actually really busy.  I was
> a waitress at the time.  I was kind of like
> joking  with  my  boss  I  wanted  to  go  home.
> Boston was -- I live in Boston, and Boston was
> on lockdown.  I'm, like, I have to go home.
> We're on lockdown.  We were really busy.  All
> the restaurants around rely on people coming
> from public transportation.  It was shut down.
> We  were  already  there  and  open.   It's  a
> breakfast  restaurant  so  all  --  we  open  at
> 7 a.m.  We were all there at 6:00 in the
> morning.  Yeah, we were busy. We were working.

Unaware of Juror 286's Twitter activity laid out above,

neither party objected to her provisional qualification, and she

was added to the list of provisionally qualified jurors.

After Juror 286's voir dire, defense counsel discovered

her Twitter posts.  On February 27, defense counsel moved to excuse

Juror 286 for cause on the basis of these posts.   The defense

argued that the posts revealed Juror 286's "community ties and allegiances, as well as her patent bias in favor of law enforcement." The defense also argued that Juror 286's "lack of candor in omitting [the posts] from her juror questionnaire" rendered her unfit to serve on the jury. Defense counsel requested that Juror 286 be excused or, in the alternative, called in for further questioning.

The district court denied this request from the bench four days later in the manner described above, finding the request both untimely and speculative. As with Juror 138, the district court in its ruling did not claim to rely on any memory of its face-to-face interview with Juror 286. Juror 286 became a seated juror and, ultimately, served as the jury foreperson. Again, our review is for abuse of discretion. Zimny, 846 F.3d at 464.

**2.**

For the reasons described above with respect to Juror 138, we disagree with the district court's conclusion that Tsarnaev's challenge to Juror 286 was untimely. Defense counsel acted diligently under the circumstances and brought Juror 286's Twitter posts to the court's attention in time for the court to investigate and take any appropriate action before empaneling the jury.

**3.**

As to the court's finding that Tsarnaev's challenges were speculative, Tsarnaev argues that the Twitter posts reveal two dishonest answers by Juror 286. First, Tsarnaev argues that Juror 286 was dishonest when she wrote that she had not "commented on this case" online. Second, Tsarnaev argues that Juror 286 dishonestly answered "N/A" when asked if she or her family had sheltered in place, as shown by her Twitter post stating that she had been working while "knowing [her] family is locked down at home" and that she was "[f]inally home locked down w/them."

We focus first on Juror 286's nondisclosure of her social media activity. When asked in her questionnaire whether she had "commented on this case in a letter to the editor, in an online comment or post, or on a radio talk show," she answered "don't believe I have." The government concedes that this question and answer were material. And Juror 286 gave a negative answer despite having tweeted and retweeted various posts -- both around the time of the bombings and in the years following -- about the bombings, the aftermath, the victims, the law enforcement personnel involved, and the community's response.

The posts themselves are not particularly strong indicators of bias. Many of them were not Juror 286's own words but rather retweets of what others have said. And it would be natural for Juror 286 -- like many others whose city had been the

location of such a horrific event as the marathon bombings -- to feel scared while the situation was developing, to stay abreast of the activities during the aftermath, and to share in a sense of community pride and resilience in the years following. Again, the critical issue here is not the posts themselves but instead the reason for their nondisclosure. If Juror 286 intentionally answered the question dishonestly, thinking that discovery of her posts referring to Tsarnaev as a "piece of garbage" and repeatedly invoking the "Boston Strong" spirit could disqualify her from serving as a juror, then that would be a powerful indicator of bias. See, e.g., McDonough, 464 U.S. at 556; French I, 904 F.3d at 116-18; Sampson, 724 F.3d at 167.

The government posits that "Juror 286 could have reasonably believed that tweeting or retweeting about events surrounding the 2013 Boston Marathon was not 'comment[ing] on this case'" because "the word 'case' ordinarily refers to legal proceedings." Gov. Br. 123. Similarly, the government argues, "she might have understood the question's reference to 'a letter to the editor, in an online comment or post, or on a radio talk show,' as referring to something more formal than a tweet or retweet." Id.

We agree with the government that Juror 286 "could have" or "might have" understood the question as the government proposes. But that does not mean -- nor does the government argue -- that it

is implausible that Juror 286 understood the question to encompass
Twitter posts about the events surrounding the marathon bombings.
It is certainly a reasonable reading of "this case" in the jury
questionnaire to refer not just to the legal proceedings themselves
but also to the bombings giving rise to the legal proceedings.
Indeed, the Supreme Court opinion in this very case describes the
question this way. See Tsarnaev, 595 U.S. at 309 (describing the
question as "ask[ing] whether the prospective juror had commented
or posted online about the bombings"). And the most natural
reading of "online comment or post" would certainly include posts
made on Twitter.

There are various possible explanations for Juror 286's
questionnaire answer. Perhaps she misunderstood the question as
the government suggests. Perhaps she forgot about the Twitter
posts. Or perhaps she answered the question dishonestly because
she thought it would increase her chances of getting onto the jury.
Upon reviewing Juror 286's Twitter posts, her questionnaire, and
her voir dire transcript, each of these explanations is plausible,
as are, perhaps, others. But the only way to shed more light on
which one is the truth is to ask Juror 286, which the district
court declined to do. As with Juror 138, more investigation was
required and Juror 286 was readily available in the courthouse.
We therefore hold that the district court exceeded the reach of
its discretion by not taking a few minutes to ask Juror 286 why

she answered as she did when asked whether she had commented on the case online.

As to Tsarnaev's second claim of bias with respect to Juror 286, the government admits that Juror 286's response of "N/A" to the shelter-in-place question was "inaccurate." Gov. Br. at 124. It appears from the record, however, that the defense never specifically argued to the district court that this inaccuracy posed a risk of juror bias. As described above, Tsarnaev's motion to excuse Juror 286 focused on Juror 286's failure to disclose her social media activity, not her failure to disclose that she and her family had sheltered in place. See United States v. Barnes, 251 F.3d 251, 257 (1st Cir. 2001) ("Trial judges are not expected to be mind readers . . . ."). The government though, does not argue waiver. And given our holding that the nondisclosure of the Twitter posts requires remand, we need not decide whether Tsarnaev waived his second ground or, if not waived, whether it would be sufficient to warrant further investigation on its own. Because the district court on remand will be conducting an inquiry aimed at assessing the honesty of the juror's answers, it would be prudent to inquire into the shelter-in-place issue as well.

### C.

Tsarnaev asks that we skip any further investigation and hold that the questionnaires, voir dire transcripts, and evidence of the jurors' social media comments were sufficient to show that

Jurors 138 and 286 should have been excused for cause. This holding would require vacating Tsarnaev's sentence and ordering a new penalty-phase proceeding.[9] See French I, 904 F.3d at 120 ("The presence of a juror whose revealed biases would require striking the juror for cause in a criminal case is structural error that, if preserved, requires vacatur.").

We decline this invitation. We have not held that either juror manifested a disqualifying bias. Rather, as we explained above, and as the district court recognized, there are innocuous potential explanations for both jurors' conduct and voir dire answers. The two jurors could have misunderstood the court's instructions or questions, or they could have forgotten about the social media posts by the time they were summoned for voir dire. Even a dishonest answer to a voir dire question does not automatically render a juror unfit to serve, if the district court determines that the reason for the dishonesty is not one that renders the juror incapable of deciding the case on the evidence. See McDonough, 464 U.S. at 556 ("The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial."). The district court's error was in failing to conduct an

---

[9] As noted in our previous opinion in this case, Tsarnaev's counsel conceded that Tsarnaev's admission of guilt at trial would allow us to affirm his guilt-phase convictions despite the alleged juror-misconduct errors. Tsarnaev, 968 F.3d at 62 n.33.

inquiry sufficient to rule out the more pernicious explanations. We remand to the district court to conduct that inquiry in the first instance.  See French I, 904 F.3d at 120.

Tsarnaev cites Morgan v. Illinois, 504 U.S. 719 (1992), and Turner v. Murray, 476 U.S. 28 (1986), for the proposition that "[i]n general, inadequate voir dire results in vacatur, not remand."  Def. Reply Br. at 59.  But those cases involved a trial court's refusal to ask a general voir dire question proposed by the defendant, rather than the failure to investigate a particular claim of juror misconduct.  See Morgan, 504 U.S. at 723 (trial court refused to ask whether prospective jurors would automatically vote to impose death penalty if they found the defendant guilty); Turner, 476 U.S. at 30-31 (trial court refused to question prospective jurors about racial prejudice).  When faced with a district court's failure to investigate plausible (but not yet proven) claims of juror misconduct, we have said that "[w]e are unwilling to disturb [a defendant's] conviction on [an] undeveloped evidentiary record when an adequate inquiry might reveal that the alleged juror misconduct did not occur in the first place."  Zimny, 846 F.3d at 472; see French I, 904 F.3d at 120 ("[W]e are aware of no case in which, faced with a potentially biased juror and the need to investigate further, an appellate court has ordered a new trial without first permitting the district court to investigate.  We decline to do so here.").  In McDonough,

for example, the Supreme Court stated that the appellate court should have remanded for an evidentiary hearing -- rather than itself ruling on the defendant's new trial motion -- when a juror failed to provide an accurate answer to a voir dire question.  464 U.S. at 551 n.3, 556.  We adhere to these principles in this case, where remand may reveal that there was no juror bias warranting a new penalty-phase proceeding.

Tsarnaev argues that such an inquiry at this point would be futile because the jurors "would have strong, perhaps insurmountable, incentives to deny having answered dishonestly and to insist on their impartiality."  Def. Reply Br. at 58.  He notes that an admission of prior perjury could give rise to criminal liability for the jurors.  He also points to the jurors' post-sentencing social media posts, which he contends suggest that they would want to insulate the verdict from challenge.  After the jury returned its penalty-phase verdict, Juror 138 posted on his Facebook page, "That's a wrap."  On the day of the sentencing, he wrote that he had gone "[b]ack to boston today...see the end of this...for now anyway."  He later posted, "Scum," and, "Atleast they finally moved that trash out of the state and making their way to the dungeon where he will be forgotten about until his time comes."  Similarly, Juror 286 changed her Facebook profile picture to a "Boston Strong" photo after sentencing.  When Tsarnaev moved for a new trial, she tweeted that one "shouldn't be allowed to

appeal when you stand up at the end of your trial and declare 'I did it' #offtherecord."[10]  "If the jurors lied during voir dire," Tsarnaev reasons, "it strains plausibility to think that either would so admit now, when truthfulness would result in vacatur of the death sentence that both believe should stand."  Def. Reply Br. at 58-59.

No doubt any juror would have strong incentives to avoid admitting having committed perjury during voir dire.  We also expect that most jurors, having taken time out of their daily lives to receive evidence at trial, deliberate with other jurors, and reach a verdict that they believe is just, would prefer not to have that verdict disturbed -- especially as a result of their own actions.  These same concerns are present in any post-trial proceeding in which the honesty of jurors' voir dire answers is

---

[10]  These posts, made after the jurors had received all the evidence and deliberated on Tsarnaev's guilt and punishment, do not support Tsarnaev's claim that the jurors were biased going into the trial.  As the government points out, the holding of such a view by one who has properly considered all the evidence "is neither surprising nor problematic."  Gov. Br. at 132; cf. Liteky v. United States, 510 U.S. 540, 550-51 (1994) ("The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person.  But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task.").  Nor did the post-trial comments violate any orders of the court.  They were made after the district court instructed the jurors that "[y]ou are now free to talk with your family and friends about the case."

called into question.  But such concerns did not prevent us from remanding in, e.g., French I, where the defendants similarly sought a new trial based on claims of juror dishonesty during voir dire.  See 904 F.3d at 120.  In this case, we have no doubt that the able district court judge can do what judges regularly do -- form a considered opinion about the sufficiency of the jurors' explanations once those explanations are given and explored.[11] See, e.g., United States v. French, 977 F.3d 114, 121-24 (1st Cir. 2020) ("French II") (affirming the district court's "rigorous and well thought-out" methodology for probing a claim of juror dishonesty years after trial).

Finally, we provide guidance about the burden of proof that will apply on remand, given the amount of time that has passed since Tsarnaev initially sought further questioning.  Our precedent is clear that, generally speaking, a defendant seeking to overturn a verdict based on alleged juror bias bears the burden of proving such bias by a preponderance of the evidence. French II, 977 F.3d at 126; Sampson, 724 F.3d at 166.  But in French I, we observed that it would be unfair if a defendant's failure to meet that burden was due to faded memories resulting from the government's opposition to a defendant's timely and

---

[11]  Indeed, an apt example is found in the district court's face-to-face inquiry of Juror 355, addressed in a later section of this opinion.

meritorious request for further questioning. 904 F.3d at 120.
Given our holding that Tsarnaev made a timely and meritorious
request for further questioning of Jurors 138 and 286, should a
faded memory preclude the court from being able to determine
whether a juror should have been excused for cause, a new penalty-
phase trial will be required. Importantly, this is not to say
that faded memories per se call for a new penalty-phase trial. As
in French II, even in the face of no affirmative memory pinpointing
the reason for an answer, a court might still find an absence of
any motive "that would cast doubt on [the juror's] impartiality."
977 F.3d at 126; see id. (affirming because "the testimony elicited
at the evidentiary hearing and the district court's
findings" -- although lacking an affirmative explanation for the
false answer -- did "eliminate[] the motives that usually tend to
show bias, and there [was] no suggestion in the record that [the
juror] had some other motive that would cast doubt on her
impartiality").

### III.

Tsarnaev's third remaining claim is that the district
court erred in concluding that another prospective
juror -- Juror 355 -- had views on the death penalty that
disqualified him from sitting on the jury. Tsarnaev argues that
the district court's dismissal of Juror 355 violated Tsarnaev's
Sixth Amendment right to an impartial jury, and therefore that his

sentence must be vacated.  For reasons we will explain, we uphold the district court's dismissal of Juror 355.

At the time of Tsarnaev's trial, Juror 355 had been a criminal defense attorney for over twenty-two years, most recently for a Massachusetts public defender agency.  Like the other prospective jurors, he filled out the juror questionnaire on January 5, 2015.  In response to a question asking for his general views on the death penalty, he wrote, "Since it is legal, it should be the rarest of punishments.  It is much too prevalent in the country."  Asked whether those views were informed by his religious, philosophical, or spiritual beliefs, he answered, "Killing people, especially gov't sponsored killing, is generally wrong.  While I can imagine a scenario where facts and law call for it, it is an exceedingly rare case."  On a scale from 1 to 10, with 1 representing "a belief that the death penalty should never be imposed" and 10 representing "a belief that the death penalty should be imposed whenever the defendant has been convicted of intentional murder," Juror 355 circled "2."  Asked about his "feelings about the death penalty in a case involving someone who is proven guilty of murder," he selected from a list: "I am opposed to the death penalty but I could vote to impose it if I believed that the facts and the law in a particular case called for it."  Another question asked more specifically whether he could conscientiously vote for the death penalty if he found Tsarnaev

guilty and decided the death penalty was the appropriate punishment. Juror 355 checked the box for "I am not sure" and explained, "I cannot possibly prejudge his guilt or potential punishment at this stage."[12]

At his individual voir dire session, Juror 355 said that his work as a criminal defense attorney would not affect his impartiality. The court and counsel then inquired about his views on the death penalty. Juror 355 stated that he accepted the legality of the death penalty, but said, "I mean, if I was asked to vote on it, I would probably vote against it because of my belief that it is overused." In explaining his selection of "2" on the scale from 1 to 10, he stated, "[W]hen I found out I was going to be in this pool, I did a lot of soul-searching, and I came to the conclusion that because I believe it should be in the most rarest of situations, that's why I'm down at that end, but I could foresee situations where I might consider it appropriate." Asked to confirm whether he could envision a case where he could vote for the death penalty, he said, "After a lot of thought and soul-searching, I think I could."

The court then attempted to explore whether this case was such a case. The court referred to the questionnaire question

---

[12] Juror 355 gave a near-identical answer to an analogous question asking whether he could conscientiously vote for life imprisonment without the possibility of release.

asking whether Juror 355 could conscientiously vote for the death penalty in this case, and then asked, "[I]f you had intellectually concluded the death penalty was appropriate, could you actually vote for it; in other words, would you have any moral or other scruple about voting for it even if you were convinced intellectually that there was a case for it to be made?" Consistent with his response on the questionnaire, Juror 355 responded, "I find it very difficult to answer that without hearing everything." The government then tried again, with a similar result:

> [PROSECUTOR:] Let me just kind of go right where Judge O'Toole just cut off, which was -- the question was if you found Mr. Tsarnaev guilty and you decided that the death penalty was the appropriate punishment, could you conscientiously vote for the death penalty. So it says -- the question is assuming -- and you're a lawyer. The question is assuming that he's guilty and that you found that the death penalty was appropriate.
> [JUROR 355]: I guess part of my problem is that I'm disturbed that I have to assume his guilt at this stage without hearing anything and to prejudge the particular case I'm asked to come and judge. I don't know that I really want to exercise that fantasy. And I'm sorry if I'm being difficult about it.

Faced with Juror 355's reluctance to consider hypotheticals about the case at hand, the court stepped in to "generalize" the question by abstracting away from the facts of Tsarnaev's case. The court asked:

> If you were sitting on a death penalty
> case where the defendant -- that is, when I
> say that, a capital case, and the defendant is
> found guilty of a capital crime, and you
> concluded that for that defendant and for that
> crime the death penalty was an appropriate
> punishment, could you conscientiously vote to
> impose it in that case?

And Juror 355 answered:

> If, after hearing the Court's
> instructions, and if I believed it was one of
> those -- it fit into one of those rare cases
> where I believed the death penalty should be
> imposed, having understood the law as given to
> me, then, yes, I could vote to impose the death
> penalty.

The court and the government then probed what Juror 355

meant by "one of those rare cases" in which he could vote to impose

the death penalty.  The following exchange occurred:

> THE COURT: Do you have a collection of
> the category of cases you're thinking of? Do
> you have some examples?
> [JUROR 355]: I don't really.
> [PROSECUTOR]: Well, can you imagine any
> case that you would think is appropriate for
> the death penalty?
> [JUROR 355]: Yes.
> [PROSECUTOR]: What?
> [JUROR 355]: I think Slobodan Milosevic
> was close, if not a prime example.[13]  Again, I
> didn't do that trial.
> [PROSECUTOR]: So genocide?
> [JUROR 355]: Genocide's a good starting
> point.
> [PROSECUTOR]: Okay.  Anything other than
> genocide?

---

[13]  Slobodan Milosevic was a former president of Serbia who
"led a campaign of genocidal aggression during the Balkan wars of
the 1990s." Tsarnaev, 968 F.3d at 49 n.20.

[JUROR 355]: I mean, I think -- I cannot
say that I have sat and thought about a list
of particular crimes or severity of crimes
where I would have a checklist of what I
thought was appropriate for the death penalty
or not.  And having never worked on a death
penalty case, I've never even read an
instruction about what, at least legally, is
considered for the death penalty or not.

I mean, everybody uses the example if
somebody hurts your child, you know, a child,
that's sort of a prime example of where people
can go.  But I like to think that we all take
a step back and that's why we have juries
decide rather than letting our emotions take
over.

Without -- I guess that's my answer.  I
have not come up with a list of cases where I
think it would be appropriate.  I mean, I'd
have to listen to the Court's instructions, I
would have to judge the facts in front of me
and determine whether or not that satisfied
me.

. . .

[PROSECUTOR]:    And    in    answer    to
Question 92   which   you   filled   out   on
January 5th,   you   said,   "Killing   people,
especially government-sponsored killing, is
generally wrong.   While I can imagine a
scenario where facts and law call for it, it
is an exceedingly rare case."

So you wrote that as your answer to 92,
right?

[JUROR 355]: Yes.

[PROSECUTOR]: And there what were you
referring to as you can imagine a scenario
where facts and law call for it?

[JUROR 355]: The Milosevic example is
usually the one I rest on when I say I can
immediately come up with a scenario.  Whether
or not there are other scenarios, again,
without knowing specifics, I find it difficult
to answer the question.

After the government finished questioning Juror 355, counsel for the defense asked, "[I]f in your conscience, your individual conscience, you decided that the death penalty was an appropriate sentence for [a] given set of facts, the question is could you then actually vote to impose it?" Juror 355 replied, "I think I could," and when asked whether he was "pretty confident of that answer," he answered, "Yes."

Following individual voir dire, the government moved to strike Juror 355, arguing that he was biased as a criminal defense attorney and that his views on the death penalty impaired his ability to serve as a juror in Tsarnaev's capital case. The defense contested both claims. The district court rejected the government's claim of bias based on Juror 355's work as a criminal defense attorney, but agreed that Juror 355's approach to the death penalty was too limited for Tsarnaev's trial. It therefore granted the government's motion. In doing so, the court stated:

> So this really is not -- I don't approach this at all on a categorical way. Everybody is different, and the value of this process is you can sit here five feet away and you can sense the being. And I -- my sense of him is different from my sense of the last juror that we just qualified who I thought is open to the possibility of the death penalty in a way that I do not think that [Juror 355] is.
> I agree that his -- the zone of possibility is so narrow, I think you would have to regard it as substantially impaired, this is the genocide issue, in contrast to her -- the other juror's examples were more possible, I guess, in the world that we'll be

operating in.  So I think he's not qualified
under the death penalty question.

I would not exclude him just because of
his criminal justice -- criminal defense
work. . . .  I think it may explain where his
alignment is on these issues, but ultimately,
it was his answers to the questions and my
sense of it.

He was a learned witness, in a sense.  He
knew what we were talking about whereas
others don't necessarily, and I guess that could go
in either direction.  But in the end, it was
not convincing to me that he was going to be
truly open in the way that would be necessary.

Ruling on a motion to exclude a prospective juror based
on the juror's attitude toward the death penalty, as the district
court did here, requires a careful balancing of important
interests.  On the one hand, the defendant has a "right to an
impartial jury drawn from a venire that has not been tilted in
favor of capital punishment by selective prosecutorial challenges
for cause." Uttecht v. Brown, 551 U.S. 1, 9 (2007).  So the court
may not exclude prospective jurors "simply because they voiced
general objections to the death penalty or expressed conscientious
or religious scruples against its infliction." Witherspoon v.
Illinois, 391 U.S. 510, 522 (1968).  On the other hand, the
government has a "strong interest in having jurors who are able to
apply capital punishment within the framework [that the] law
prescribes." Uttecht, 551 U.S. at 9.  So the court may exclude a
prospective juror if "the juror's views would 'prevent or
substantially impair the performance of his duties as a juror in

accordance with his instructions and his oath.'" Wainwright v.
Witt, 469 U.S. 412, 424 (1985) (quoting Adams v. Texas, 448 U.S.
38, 45 (1980)).  Thus, trial courts face "the difficult task of
distinguishing between prospective jurors whose opposition to
capital punishment will not allow them to apply the law or view
the facts impartially and jurors who, though opposed to capital
punishment, will nevertheless conscientiously apply the law to the
facts adduced at trial." Id. at 421.

    When reviewing a trial court's handling of this
difficult task, we "owe deference to the trial court," Uttecht,
551 U.S. at 22, and we reverse only for abuse of discretion, United
States v. Sampson, 486 F.3d 13, 39 (1st Cir. 2007).  The deference
is because of the trial court's "superior position to determine
the demeanor and qualifications of a potential juror." Uttecht,
551 U.S. at 22.  We appellate courts have nothing to go on but a
cold transcript containing the text of the questions asked and the
juror's responses.  But "determinations of juror bias cannot be
reduced to question-and-answer sessions which obtain results in
the manner of a catechism." Witt, 469 U.S. at 424.  The appellate
record displays only the words that were spoken -- not how they
were spoken or the body language of their speaker.  "[D]emeanor,"
the Supreme Court has said, is "a factor of critical importance in
assessing the attitude and qualifications of potential jurors."
Uttecht, 551 U.S. at 9; see id. ("Leading treatises in the area

make much of nonverbal communication."). The appellate record therefore cannot possibly capture all that goes into a determination of juror qualification.

By contrast, the trial court is "[f]ace to face with living witnesses." Witt, 469 U.S. at 434 (quoting Marshall v. Lonberger, 459 U.S. 422, 434 (1983)). So "[d]espite this lack of clarity in the printed record . . . there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." Id. at 425–26. Accordingly, "[e]ven when '[t]he precise wording of the question asked of [the venireman], and the answer he gave, do not by themselves compel the conclusion that he could not under any circumstance recommend the death penalty,' the need to defer to the trial court remains because so much may turn on a potential juror's demeanor." Uttecht, 551 U.S. at 8 (second and third alterations in original) (quoting Darden v. Wainwright, 477 U.S. 168, 178 (1986)).

Unlike its rulings concerning Jurors 138 and 286, the district court's conclusion that Juror 355's ability to apply the law would be substantially impaired was grounded in precisely these types of "demeanor and credibility [determinations] that are peculiarly within a trial judge's province." Witt, 469 U.S. at 428. The district court recognized that "the value of this process is you can sit here five feet away and you can sense the being."

And the district court's observation of Juror 355 led to a "sense of him" that he was not "open to the possibility of the death penalty" in Tsarnaev's case. Based on "his answers to the questions and [the court's] sense of it," the district court concluded that Juror 355's "zone of possibility" of applying the death penalty was "so narrow" that the juror's performance of his duties would be substantially impaired "in the world that we'll be operating in."

Of course, the deference owed to the trial court's determinations is not absolute, and we may reverse if "the record discloses no basis for a finding of substantial impairment." Uttecht, 551 U.S. at 20. But here the record supports -- rather than contradicts -- the district court's conclusion that Juror 355's zone of possibility was too narrow for this case.

Juror 355 repeatedly declined to directly answer questions getting at his ability to vote to impose the death penalty if the facts and law called for it in Tsarnaev's case. As the government points out, "[a]s a long-time criminal defense attorney, Juror 355 clearly knew how to ask (and presumably answer) hypothetical questions." Gov. Br. at 150. The district court picked up on this, observing that Juror 355 "was a learned witness, in a sense," and that "[h]e knew what we were talking about whereas others don't necessarily."

Juror 355's refusal to provide straight answers to questions pertaining to Tsarnaev's case stands in stark contrast to his response once the district court generalized the question by asking about "a capital case" without tying the question to any facts.  Then, Juror 355 answered that "yes, [he] could vote to impose the death penalty" if the case "fit into one of those rare cases where [he] believed the death penalty should be imposed." Asked to elaborate on what types of cases might be included in "those rare cases," Juror 355 gave only the example of genocide.

Tsarnaev points to several instances in voir dire when Juror 355 stated that he would be able to vote in favor of the death penalty.  But in each of those instances, Juror 355's affirmance of his ability to do so was untethered from any factual scenario (with the exception of genocide), suggesting merely that he could conceive that there would be cases in which he could vote to impose the death penalty -- not that he could do so in a case anything like the one charged against Tsarnaev.  Even when the defense attempted to rehabilitate him, Juror 355 confirmed only that he thought he could vote for the death penalty if he "decided that the death penalty was an appropriate sentence for [a] given set of facts," without any indication as to what sets of facts might lead him to that conclusion.  So the district court was left without any assurance that Juror 355 would be able to vote in favor

of the death penalty in any case without facts comparable to genocide.

In addition, even had Juror 355's affirmations pertained more to this case, the district court was on firm footing to conclude that Juror 355's other answers and demeanor outweighed his general assertions that he could follow the law. See Uttecht, 551 U.S. at 18 ("Juror Z's assurances that he would consider imposing the death penalty and would follow the law do not overcome the reasonable inference from his other statements that in fact he would be substantially impaired in this case . . . [and] did not require the trial court to deny the State's motion to excuse [him]."); Sampson, 486 F.3d at 41 (upholding exclusion of prospective jurors even though the jurors "may have indicated some degree of willingness to put aside personal biases" against the death penalty).

A prospective juror's inability to vote to impose the death penalty in the case at hand need not be demonstrated with "unmistakable clarity." Witt, 469 U.S. at 424. Given Juror 355's repeatedly stated opposition to the death penalty except in "exceedingly rare" cases, his inability to provide an example in which he could vote to impose it other than genocide, and his unwillingness to directly answer questions regarding his ability to vote for it if he deemed it the proper sentence in the case at hand, we see no error with the district court's conclusion that

Tsarnaev's case fell outside of Juror 355's "zone of possibility." Tsarnaev concedes that a trial court may discharge "venirepersons who could vote to impose the death penalty only in circumstances not present in the trials for which they were summonsed."  Def. Reply Br. at 68-69.  And other circuits have upheld the exclusion of prospective jurors in such cases.  See United States v. Rodriguez, 581 F.3d 775, 793 (8th Cir. 2009) ("[g]enocide" or "somebody like Hitler or Stalin or a person in Bosnia"); United States v. Fell, 531 F.3d 197, 211 (2d Cir. 2008) ("'unforgivable type[s] of war crimes' like genocide or mass murder" (alteration in original)); United States v. Fields, 516 F.3d 923, 937 (10th Cir. 2008) ("genocide; torture; and willful killing of children"); Morales v. Mitchell, 507 F.3d 916, 942 (6th Cir. 2007) ("mass murder or torture").

Tsarnaev contends that the district court's ruling was based on the mistaken belief that Juror 355 could consider the death penalty only in cases of genocide, when in fact Juror 355 offered genocide as a "starting point."  This argument misconstrues the district court's reasoning.  The district court found that Juror 355's "zone of possibility" was "so narrow" that it did not encompass "the world that we'll be operating in."  The court did not find that Juror 355's "zone of possibility" included only genocide -- just that it did not include Tsarnaev's case.  And as we have just explained, this conclusion was reasonable given the

district court's observations during voir dire.  The district court's reference to "the genocide issue" simply reflects that Juror 355's inability to provide any other examples evinced the narrowness of his "zone of possibility."

Tsarnaev also contends that our deference to the district court's findings is "inappropriate" in this case because the district court applied "the erroneous legal premise that Juror 355, having given one example of a death-appropriate case, had to give others."  Def. Br. at 176.  But a court may properly allow inquiry into the types of cases in which a prospective juror could consider the death penalty as required by law.  Uttecht, 551 U.S. at 148.[14]  When Juror 355 was unable to come up with examples other than genocide -- after refusing to directly answer whether

---

[14]  The cases that Tsarnaev says "approve courts' refusal to ask prospective jurors for examples of cases where they would (or would not) vote for death," Def. Br. at 177, are inapposite.  See United States v. Caro, 597 F.3d 608, 614 (4th Cir. 2010) (defendant did not challenge on appeal the omission of the part of his proposed question asking for examples); Spivey v. Head, 207 F.3d 1263, 1273 (11th Cir. 2000) (finding voir dire "constitutionally adequate" because, although trial court did not permit defense counsel to ask, "In what type of cases do you think the death penalty would be appropriate?," it permitted other questions with sufficiently broad scope); McQueen v. Scroggy, 99 F.3d 1302, 1329–30 (6th Cir. 1996), overruled on other grounds by In re Abdur'Rahman, 392 F.3d 174 (6th Cir. 2004) (defense counsel's proposed question, "In what kinds of cases do you think the death penalty is warranted?," was irrelevant to whether a juror would consider penalties other than death in the case at hand).  Moreover, the discretion to disallow such questions in certain circumstances is perfectly compatible with the discretion to allow similar questions in other circumstances.

he could vote for the death penalty in Tsarnaev's case, if he found it appropriate -- the district court rationally took this as a sign that the scope of cases in which Juror 355 could consider the death penalty was narrow.  Although it is true that "a prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him," it is equally true that he must be able and willing "to consider" the death penalty in the capital case for which he is summoned. Witherspoon, 391 U.S. at 522 n.21.  The district court reasonably concluded that Juror 355's ability to do so was substantially impaired in this case.

Finally, Tsarnaev argues that the district court "handled this issue in an 'internally inconsistent' manner" by "qualif[ying] pro-death penalty jurors, over the defense's Witt objections, without requiring those jurors to provide examples of the circumstances in which they would deem a sentence of life imprisonment appropriate."  Def. Br. at 178.  Tsarnaev points to Juror 260, who described himself as a "7" on the 1-to-10 scale and who stated during voir dire that "there are crimes and times for which a death penalty is the appropriate punishment."  The parties agree that Juror 260, when asked during voir dire, was unable to come up with examples in which the death penalty would not be

appropriate.[15]  The defense moved to strike Juror 260 -- albeit not
on these precise grounds -- and the district court denied the
motion.  Tsarnaev argues that "[i]t was illogical and inequitable
to grant the government's cause challenge to Juror 355 because he
suggested one non-exclusive example, while denying the defense's
cause challenge to Juror 260, who could muster none at all."  Def.
Br. at 179.

Tsarnaev's argument overlooks important differences
between Juror 355 and Juror 260.  Juror 355 stated his view that
the death penalty is "generally wrong" and should be imposed only
in "an exceedingly rare case" or "the most rarest of situations."
Juror 355's inability to provide examples other than genocide
suggested that the "rarest of situations" in which he could
consider the death penalty did not encompass cases like Tsarnaev's.
By contrast, Juror 260's statement that "there are crimes and times
for which a death penalty is the appropriate punishment" does not
suggest that Juror 260 would vote to impose the death penalty in
all but the "rarest of situations," or that Juror 260 would be

---

[15]  We read the record differently than the parties.  Although
the district court initially asked, "[W]hat are the circumstances
where it would not be appropriate?," the government interjected
before the prospective juror could answer.  The court then "c[a]me
at it a little different way" and asked Juror 260 to "give some
idea" of what he thought were the "appropriate circumstances" for
the death penalty.  It was in response to this question that the
prospective juror said he would prefer not to answer in the
abstract.  But because it does not change our holding, we accept
the parties' interpretation.

unable to apply the court's instructions to the facts of Tsarnaev's case.  Juror 260's inability to come up with examples was therefore far less noteworthy than Juror 355's.  As the district court noted, "[e]verybody is different," and it was reasonable for the district court to assign different weight to the lack of examples from various prospective jurors based on their other answers and demeanors.

**IV.**

Tsarnaev's final remaining claim is that the district court erred in admitting into evidence a video of Tsarnaev purchasing milk at a Whole Foods grocery store shortly after the bombings.  At trial, the government used the video to demonstrate Tsarnaev's lack of remorse.  Tsarnaev contends that the government obtained the video as a result of an involuntary statement he made under interrogation from FBI agents while hospitalized and before being given warnings required by Miranda v. Arizona, 384 U.S. 436 (1966).

The statement at issue was made during extensive questioning by two FBI agents at the hospital following Tsarnaev's arrest and surgery for gunshot wounds to his face and extremities. The agents did not Miranda-ize him, nor did they allow lawyers from the federal public defender's office to see him.  At some point during the overnight questioning between April 21 and 22, 2013, Tsarnaev told the agents that "[o]n the way back to

Cambridge" after the bombings, he and his brother "stopped at a Whole Foods . . . to buy some milk" because "[t]hey were observing the Muslim tradition of fasting on Mondays and Thursdays and needed milk to break the fast."[16]

During the guilt phase of the trial, the government introduced evidence related to Tsarnaev's trip to Whole Foods. It called as a witness the manager of the Whole Foods store, who testified that two FBI agents came into the store and that, upon their request, she showed them the store's surveillance footage from the day of the bombings. When the government offered a video of the surveillance footage into evidence, defense counsel stated that the defense had "[n]o objection" to the video's admission. The video then played for the jury. It showed Tsarnaev enter the Whole Foods at 3:12 p.m., walk to the dairy aisle, examine two different containers of milk, select one, pay in cash, leave the store, and get into the passenger seat of a vehicle in the parking lot. About a minute later, Tsarnaev re-entered the Whole Foods, exchanged the container of milk for a different one, and left. After the video played, the government introduced -- through the same witness -- a computer-generated receipt from the Whole Foods confirming that Tsarnaev had paid $3.49 in cash for a half-gallon of milk at 3:14 p.m. The receipt indicated that it was "[r]eported

---

[16] This language comes from an FBI report of the interrogation.

at" -- i.e., retrieved on -- April 23, 2013, at 5:20 p.m., the day after the agents had finished questioning Tsarnaev at the hospital. Defense counsel stated that the defense also had "[n]o objection" to the receipt's admission into evidence.

It was not until three trial days after the video had come into evidence and played for the jury that the defense changed its position. In the meantime (two trial days after the video played), the government had called an FBI agent to testify about Tsarnaev's movements during the aftermath of the bombings, based on cell phone location information. While so testifying, the agent stated, "[A]t the time the investigation was occurring, we had received information, I believe, from a witness that the people involved stopped at a Whole Foods." As a result of that tip, the agent "told the investigative team that they probably want to go to the Whole Foods and look at the video."

At a conference with the trial judge the following day, defense counsel said that "it hadn't occurred to [her]" until the FBI agent was asked, "'Did you receive information that the defendant Tsarnaev had gone to Whole Foods' and he said 'yes,' that was something that was Mr. Tsarnaev's hospital statement, that he'd gone to Whole Foods." She said that she "hadn't really thought about . . . how the FBI got to the Whole Foods video in the first place until he said, 'I got information.'" But, now that she had thought about it, "the chronology lines up" in a way

that suggests Tsarnaev's hospital statement was the source of the government's information about Whole Foods.  Defense counsel requested that, "to the extent the government is offering evidence that was derived from information provided by Mr. Tsarnaev, the issue of voluntariness may be joined and should be, we think, addressed before that evidence is . . . admitted."

The government represented to the court that the witness that the FBI agent had referred to "was somebody else entirely" -- "a civilian witness who was not involved in the investigation" -- and that the agent's suggestion to check out the Whole Foods "was based on . . . what information that person had." The government also took issue with the timing of the defense's objection, noting the potential for "opportunistic attack[s]" that the defense could "rais[e] post fact, either now or on appeal, by mining the defendant's hospital statement and trying to find anything that overlaps with evidence that the government has presented."

The defense requested that "the government . . . provide some documentation" to support its contention that the Whole Foods tip came from an independent source.  The district court denied this request, stating, "I don't think that's necessary under the present circumstances."

A motion to suppress evidence must be made before trial "if the basis for the motion is then reasonably available and the

motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(C).  Far from a meaningless formality, this rule serves important purposes.  A pretrial motion gives the parties time to carefully brief complex issues, the judge the chance to thoughtfully assess the parties' arguments, and the government the ability to appeal an adverse ruling without encountering a double-jeopardy problem.  See United States v. Castro-Vazquez, 802 F.3d 28, 32 (1st Cir. 2015) ("'[W]ere a defendant able to delay such a motion until trial, he could prevent the government from appealing' because jeopardy would have attached at trial." (quoting United States v. Barletta, 644 F.2d 50, 54 (1st Cir. 1981))).

Ordinarily, therefore, "the failure to move to suppress particular evidence before trial result[s] in 'waiver' of any objection."  United States v. Walker-Couvertier, 860 F.3d 1, 9 (1st Cir. 2017); see id. at 9 n.1 (noting that the December 2014 amendments to Rule 12 "did not substantively change the rule," which previously used the term "waiver").  And a party who waives a claim before the district court "is not entitled to any appellate review."  Id. at 9; see United States v. Reyes, 24 F.4th 1, 16 n.8 (1st Cir. 2022) ("[I]n the First Circuit, unpreserved arguments under Fed. R. Crim. P. 12(b)(3) and (c)(3) 'cannot be raised on appeal absent a showing of good cause,' and parties are 'not entitled to plain error review.'" (citations omitted) (quoting United States v. Lindsey, 3 F.4th 32, 41–42 (1st Cir. 2021))).  A

defendant may nevertheless avoid this rule upon a showing of "good cause" for the untimeliness. Fed. R. Crim. P. 12(c)(3). "This good cause standard gives Rule 12(c) some bite, underscoring the district court's authority to set and enforce motion-filing deadlines." United States v. Santana-Dones, 920 F.3d 70, 80 (1st Cir. 2019). An exception for good cause is "rarely granted." United States v. Santos Batista, 239 F.3d 16, 19 (1st Cir. 2001).

Of course, a party can be expected to object to evidence pretrial only if that party has reason to know that the evidence may be tendered at trial. Toward that end, the rules require the government to disclose pretrial, upon a defendant's request, items within the government's control that it "intends to use . . . in its case-in-chief at trial." Fed. R. Crim. P. 16(a)(1)(E). The government was also required to provide to Tsarnaev, before trial, lists of witnesses and exhibits that it intended to use in its case-in-chief, as well as copies of those exhibits. See D. Mass. Loc. R. 117.1(a)(8). Tsarnaev does not contend that the government failed to comply with these requirements.

Rather, Tsarnaev points out that the government also promised pretrial that it did "not intend to use Tsarnaev's [hospital] statements in its case-in-chief at trial or at sentencing." He argues that it was reasonable for his counsel to rely on that explicit commitment as meaning that the government

was not going to use evidence that it knew was the fruit of those statements. We agree.

The question then becomes: What changed so as to make the government's implicit commitment not to use the fruits of Tsarnaev's statement no longer reliable? The defense did not object to the Whole Foods evidence either before trial or during trial when it was introduced. To the extent the reason for the belated distrust was that defense counsel for the first time "thought about" the timing of the FBI's investigation of Whole Foods in relation to Tsarnaev's statement, any such argument was waived because that information was previously available to the defense. Fed. R. Crim. P. 12(b)(3); see Walker-Couvertier, 860 F.3d at 9; Reyes, 24 F.4th at 16 n.8.

The only other justification for the untimeliness offered by Tsarnaev is the FBI agent's testimony that the Whole Foods investigation was prompted by a tip from "a witness." "That testimony," says Tsarnaev, "for the first time[] raised the possibility that the witness was Tsarnaev himself." Def. Reply Br. at 141. But the information that the tip came from "a witness" could hardly have been a surprise. While there are certainly other means by which the FBI could have uncovered Tsarnaev's stop at Whole Foods, a tip from a witness was always a possibility, especially given that the FBI had reason to begin questioning the friends and family members of Tsarnaev and his brother before going

to Whole Foods.  And, as described above, the only reason to think that the witness was Tsarnaev himself -- his hospital statement and the soon-thereafter FBI investigation of Whole Foods -- was available to the defense before trial.

On this record, we think that the district court hardly abused its discretion in doing what defense counsel had done at the beginning of the trial, i.e., concluding that there was no reason to question the government's (by then express) representation that its evidence originated with a source other than Tsarnaev himself.  To hold otherwise would be to mandate mid-trial detours based on unjustified claims that reliance on pretrial agreements was no longer warranted.

To summarize:  The defense reasonably relied on representations of the government to conclude that the video and the receipt, together with associated testimony, were admissible.  Thereafter, no new information arose to suggest that the government's representation was not accurate.  So, the district court was well within its discretion to reject a request for a mid-trial foray to explore a belated accusation for which the record provided no support.

**V.**

We briefly sum up where Tsarnaev's case stands after the road just traveled.  This opinion disposes of three of Tsarnaev's four remaining claims of error.  We <u>vacate</u> only the district

court's ruling denying Tsarnaev's motion to strike for cause
Jurors 138 and 286, and we <u>remand</u> this case to the district court
only to conduct an appropriate investigation of the potential bias
suggested by the apparent discrepancies between the answers of
Jurors 138 and 286 to the court's inquiries in jury selection and
the information contained in their social media communications.
If the investigations establish that either juror suffered from a
disqualifying bias, or that faded memories render the court unable
to determine whether or not a juror suffered from such a bias, the
court should at that point vacate Tsarnaev's death sentence and
only then conduct a new penalty-phase proceeding.  Otherwise, it
should reenter its denial of the motion to strike.  In either case,
his convictions and his life sentences will remain.

        We retain jurisdiction to conclude the appeal after the
district court on remand has ruled on the motion to strike.  <u>See</u>
Fed. R. App. P. 12.1 advisory committee's notes; <u>Zimny</u>, 846 F.3d
at 472-73.  The parties shall notify the Clerk of this court when
the district court has decided the motion on remand in accordance
with Fed. R. App. P. 12.1(b).

**OPINION, DISSENTING IN PART, FOLLOWS**

HOWARD, **Circuit Judge, dissenting in part**.  While I agree with the majority's treatment of each of the other issues in this appeal, I do not agree with the decision to remand for additional investigation of the juror-bias claims.  Because I cannot deduce that the district court abused its considerable discretion in conducting jury selection and in addressing claims of juror misconduct, I respectfully dissent.

## I.

To obtain a new penalty phase of the trial, Tsarnaev "must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause."  McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984).  To satisfy this test, Tsarnaev must show that an honest response would have demonstrated that the juror was biased.  See Sampson v. United States, 724 F.3d 150, 165 (1st Cir. 2013) ("[O]nly '[d]emonstrated bias in the responses to questions on voir dire may result in a juror's being excused for cause.'") (second alteration in original) (quoting McDonough, 464 U.S. at 554)).  A biased juror is one who lacks the capacity or the will to decide the case based solely on the evidence.  Id. at 165-66.  "[T]he Constitution lays down no particular tests [for assessing bias] and [the] procedure is not chained to any ancient and artificial formula."  United States v. Wood, 299 U.S. 123, 146

(1936). And our review of a district court's bias determination is only for abuse of discretion.

It is useful to keep in mind just how deferential our abuse of discretion review is when conducted in the context of a claim of juror bias or other misconduct. As we recently reiterated, "[b]ecause the district court has the benefit of observing and interacting with potential jurors, we cede substantial deference to that court in assessing potential juror bias." United States v. Encarnacion, 26 F.4th 490, 502 (1st Cir. 2022). In fact, as we have long acknowledged, "[t]here are few aspects of a jury trial where we would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause in the empanelling of a jury." Id. (quoting United States v. McCarthy, 961 F.2d 972, 976 (1st Cir. 1992)). And our deference in this area is so broad because the district court's proximity to the jurors and its participation in voir dire are critical to an assessment of a juror's credibility and bias. See Wainwright v. Witt, 469 U.S. 412, 428 (1984) ("[T]he question whether a venire[person] is biased has traditionally been determined through voir dire culminating in a finding by the trial judge concerning the venire[person]'s statement of mind. . . . [S]uch a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province.").

Moreover, our deference is not limited to only the district court's ultimate conclusion as to misconduct or bias; it extends to the scope, nature, and form of the inquiry that the district court conducts into misconduct claims. See United States v. Boylan, 898 F.2d 230, 258 (1st Cir. 1990) (explaining that "[w]hen a colorable claim of jury misconduct surfaces, the district court has broad discretion to determine the type of investigation which must be mounted" and rejecting the "imposition of a rigid set of rules for the conduct of inquiries" by the district court); Sampson, 724 F.3d at 165 ("Any inquiry into potential bias in the event of juror dishonesty must be both context specific and fact specific."). Thus, while I have no quarrel with the majority's position that "defendants seeking to establish juror misconduct bear an initial burden only of coming forward with a 'colorable or plausible' claim," and that "[o]nce defendants have met this burden, an 'unflagging duty' falls to the district court to investigate the claim," United States v. French, 904 F.3d 111, 117 (1st Cir. 2018) (quoting United States v. Zimny, 846 F.3d 458, 464 (1st Cir. 2017)), it is for the district court -- not us -- to fashion that investigation.

With this framing in mind, I cannot agree with the majority that remand is required here. Although the majority correctly identifies that our review is for abuse of discretion,

in my view, it does not accord the district court the discretion
that is due.

## II.

## A.

To begin, I worry that, as a practical matter, the
majority's holding establishes an inflexible procedural
requirement in cases involving voir dire of prospective jurors
from large jury pools.  The holding seemingly calls for a district
court to conduct further questioning of a juror whenever a
plausible claim of juror misconduct surfaces prior to the
empanelment of the jury.  This requirement takes away from the
district court any discretion in determining how to investigate
and address such claims.  Indeed, just last year in this very same
case, we were admonished by the Supreme Court to refrain from
imposing supervisory legal rules that usurp or undermine a district
court's authority to manage voir dire.  See United States v.
Tsarnaev, 595 U.S. 302, 316 (2022)("[L]ower courts cannot create
prophylactic supervisory rules that circumvent or supplement legal
standards set out in decisions of this Court.").  Yet, that is
precisely what the majority seeks to do here.  By requiring the
district court to adhere to a specific procedural course of conduct
in the face of an allegation of juror misconduct, and by treating
the district court's considered decision not to do so as an
automatic abuse of discretion, the majority robs the district court

of any true power to address such claims and otherwise manage voir dire. Indeed, by explicitly requiring the district court to conduct a specific type of inquiry, with specific questions crafted by the appellate court, the majority "supplant[s] the district court's broad discretion to manage voir dire by prescribing [a] specific line[] of questioning, and thereby circumvent[s]" our abuse of discretion review. Id. at 317.

As the Supreme Court noted the last time our court took such a tack, "[w]hatever the 'supervisory power' entails, it does not countenance [our court's] use of it" to "hand[] down a purported legal rule . . . and then conclude[] that the [district court] commit[s] legal error when it fail[s] to comply with that rule." Id. at 1036. The majority's holding not only oversteps our bounds as an appellate court, it eliminates the authority of the district court, the court incontrovertibly best suited to be making the critical decisions regarding juror fitness and impartiality.

## B.

Reviewing the district court's conduct with what I believe to be the appropriate deference, I conclude that there was ample basis for the district court to arrive at a judgment that the two jurors in question were not improperly biased, and thus the court engaged in no abuse of its exclusive power when it

declined to subject those jurors to the further questioning that the majority demands.

The district court's assessment of the jurors' fitness was based on its review of their answers to the 100 questions that were posed on the juror form, as well as, and more importantly, its in-person observation and face-to-face individualized examination of each of the jurors. This individualized and personal examination of jurors is a critical means for a district court to evaluate bias and develop an impression of a juror's ability to apply the law to the facts impartially. See Tsarnaev, 595 U.S. at 312-13 ("We have repeatedly said that jury selection 'falls particularly within the province of the trial judge.' That is so because a trial 'judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record,' such as a 'prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty.'" (quoting Skilling v. United States, 561 U.S. 358, 386 (2010)) (internal citations omitted)).

Here, given the relative weakness of Tsarnaev's misconduct claims against either juror, the district court's decision to rely on its own impressions of the two jurors, without the need for further questioning, cannot be deemed an abuse of the district court's discretion.

### i. Juror 138

Tsarnaev argues that Juror 138 made two knowingly dishonest statements during voir dire.  First, Tsarnaev contends that Juror 138 was dishonest with the court about his own use of Facebook.  Second, he asserts that Juror 138 was dishonest with the court about Facebook use by others.  I am unconvinced that the district court was required to find that Tsarnaev has established knowing dishonesty plausibly revealing bias as to either charge.

During oral voir dire, the court asked Juror 138 whether he had been able to comply with the court's instruction "to avoid any discussion of the subject matter of the case . . . and also to avoid any exposure to media articles about the case" (while reiterating its prior instruction that, "obviously," jurors could "talk about coming" to court).  Juror 138 responded that he had not "talked to anybody about it."  Tsarnaev argues that this response was knowingly dishonest and was intended to conceal conduct that would have resulted in Juror 138 being struck from the venire.  In the Facebook comments at issue, Juror 138 explained how many potential jurors had been summoned to the courthouse, how the voir dire process would work, how long the trial was expected to last, that either the jury-selection process or trial (it is unclear to which he was referring) "[s]hud be crazy," and that he was in close proximity to Tsarnaev and his attorneys but he "can't say much else about it tho...that's against the rules."  These

comments easily fall within a reasonable layperson's understanding
of the scope of the court's instruction that jurors could "talk
about coming" to court but could not discuss the subject matter of
the trial.  The district court could conclude that there was no
dishonesty -- let alone dishonesty demonstrating bias -- in Juror
138's response during voir dire.

Next, Tsarnaev argues that Juror 138 lied when he
reported that none of his Facebook friends were "commenting about
this trial."  Tsarnaev argues that this denial was intentionally
dishonest, given that multiple people had commented on the Facebook
post that Juror 138 made at the time that he filled out his juror
questionnaire.  These included comments such as: "If you're really
on jury duty, this guys got no shot in hell"; "They're gonna take
one look at you and tell you to beat it"; and "Play the part so u
can get on the jury then send him to jail where he will be taken
care of."  While Juror 138's response was untrue and likely
dishonest, thus triggering the district court's duty to probe for
potential bias, the court effectively investigated whether Juror
138 would have been subject to a for-cause challenge had he
responded truthfully.

Tsarnaev does not explain how the comments made by others
would have been grounds for a challenge for cause to Juror 138,
where Juror 138 neither endorsed nor responded to those comments.
Indeed, the district court considered whether the posts

demonstrated bias and gave, appropriately, little weight to the argument that the conduct of others could or did demonstrate bias on the part of Juror 138 himself.  Furthermore, Juror 138 explicitly stated in his own post that he was subject to court rules which prevented him from discussing the case beyond that he had appeared.  And, after the remarks in question were made by Juror 138's Facebook friends (seemingly in direct response to a suggestion by one of his friends that he "play the part so u get on the jury and send him to jail where he will be taken care of"), Juror 138 remarked that he would not take his chances with breaking any of the court's rules.

Finally, any argument that Juror 138's dishonesty was motivated by a desire to secure a place on the jury is undermined by his disclosure that he had told family members about his potential jury service, and that those family members were jealous of his potential service on the jury at Tsarnaev's trial.  The trial judge was entitled to conclude that the fact that Juror 138 disclosed communications weighed against Tsarnaev's claim that Juror 138 deliberately withheld information due to a bias against Tsarnaev and a desire to exercise that bias as a juror.  Of course, I agree with the majority that it is "at least plausible" that Juror 138 did not think that disclosing these comments involving his family members would hurt his chances of being selected.  But given that the district court individually questioned and assessed

the credibility of Juror 138 during voir dire, I believe that we must defer to its conclusion.

### ii. Juror 286

Tsarnaev argues that Juror 286 made two intentionally dishonest statements in order to secure a place on the jury. This argument, too, is unconvincing.

First, Tsarnaev contends that Juror 286 lied on her questionnaire about whether she or persons close to her sheltered-in-place during the search for Tsarnaev. While it is undisputed that her negative answer was incorrect, Tsarnaev's claim is critically undermined by the fact that, during her individual voir dire examination, Juror 286 acknowledged that both she and her family had been subject to the lockdown on the day of the search. During her voir dire examination, Juror 286 offered this information and thus corrected her inaccurate questionnaire response (albeit without acknowledging that she had previously reported otherwise). When asked about the shelter-in-place order, Juror 286 explained that she was working outside of the locked-down area, which included her home, and that she "was kind of like joking with my boss [that] I wanted to go home. Boston was -- I live in Boston, and Boston was on lockdown. I'm, like, I have to go home. We're on lockdown." Furthermore, as the government notes, this answer was given in response to a question that asked simply whether Juror 286's co-workers discussed the bombing when

it happened and that did not directly concern the shelter-in-place. That Juror 286 willingly volunteered this information even when it was not called for by the question that was posed belies Tsarnaev's claim that Juror 286 sought to conceal the fact that she was "personally affected" by the bombings so as to secure a place on the jury.

Second, Tsarnaev contends that Juror 286's responses about her social media habits, and her claim that she had not discussed Tsarnaev's case online, were false. This contention is also unavailing. The online activity in question was, by and large, quite innocuous and consisted primarily of Juror 286 tweeting or re-tweeting messages of support and sympathy for the victims and first responders directly affected by the events of April 15, 2018 and its aftermath. And, the most-damning evidence that Tsarnaev highlights -- a post which referred to him as a "piece of garbage" -- was written by someone other than Juror 286 and merely re-tweeted by her.

Tsarnaev's argument that Juror 286 knowingly and deliberately concealed this activity to secure a place on the jury is further undermined by: (1) the fact that the tweets were publicly available, cf. United States v. Maxwell, 2022 WL 986298, at *9 (S.D.N.Y. Apr. 1, 2022) (finding it to be the most logical explanation that a juror's mistaken responses were inadvertent, and not deliberate, because to find otherwise "requires concluding

that he willingly disclosed his deliberate and unlawful deception in public" and opened himself up to potential legal consequences); (2) the fact that Juror 286 willingly disclosed various other pieces of information which may have weighed against her inclusion on the jury (including the fact that she went to the Boston Strong Concert at the Boston Garden, purchased a Boston Strong t-shirt, that people in her life were offering her advice on how to get out of jury duty, and that she had seen a moderate amount of coverage about this case in advance of being summoned to the court); and (3) the fact that Juror 286's allegedly dishonest response to the question regarding her social media habits was conditional ("I don't believe I have") whereas her responses to nearly every other question in the questionnaire were definitive.  Her decision not to give a definitive answer likely shows that, as the government argues, Juror 286 was unsure of whether her tweets and re-tweets from years prior fell within the scope of the question.  An honest juror need not divulge more information than is specifically requested by the questions that she is asked, and it is incumbent on the defense, if it wishes to elicit information beyond the scope of the question posed, to ask follow-up questions.  See, e.g., Billings v. Polk, 441 F.3d 238, 245 (4th Cir. 2006); see also Porter v. Zook, 803 F.3d 694, 697 (4th Cir. 2015) ("[A] juror's failure to elaborate on a response that is factually correct but less than comprehensive may not meet th[e] standard [of dishonesty]

where no follow-up question is asked."); Fitzgerald v. Greene, 150
F.3d 357, 363-64 (4th Cir. 1998) (rejecting a McDonough claim where
a juror, whose granddaughter had been molested, disclosed during
voir dire that no member of her family had been "raped" because
the trial court limited its questioning to rape and did not ask a
follow-up question about molestation).

### C.

Given the relative weakness of the claims against either
juror, it was well within the district court's broad authority to
determine that it did not need to subject the jurors to further
questioning. It had already considered the evidence provided by
Tsarnaev, reviewed the juror's questionnaires and voir dire
transcripts, and -- most importantly -- individually examined each
juror during voir dire.

Rather than accord the district court the substantial
deference that should follow from this first-hand experience, the
majority discounts the district court's assessment of the two
jurors in question, reasoning that the court did not explicitly
state that it relied on its individual voir dire sessions and that
we cannot infer that the court recalled its reliance on those
interviews due to the volume of voir dire. This rationale,
however, overlooks the purpose of a McDonough investigation. At
the time Tsarnaev raised his claims of juror bias, the district
court had already found, based on each juror's answers and demeanor

at voir dire, that the jurors were "capable and willing to decide the case solely on the evidence," Sampson, 724 F.2d at 165 (quoting McDonough, 464 U.S. at 554).  Investigating the juror-bias claims, then, requires the district court to determine whether the jurors' misstatements are so suggestive of bias as to overcome this finding.  Thus, even if the judge somehow could not recall the juror's individual voir dire sessions, as the majority suggests, our court must accord some weight to the court's initial determination of the juror's credibility as to impartiality.  See United States v. Meader, 118 F.3d 876, 881 (1st Cir. 1997) ("Assessment of [a] juror's credibility as [the juror] responds to the [court's] questioning is uniquely the domain of the district court . . . .").

Finally, our decision in United States v. French, 904 F.3d 111 (1st Cir. 2018) ("French I") does not, contrary to the majority's argument, require that the district court conduct additional proceedings.  In that case, which seemingly serves as the basis for the supervisory rule that the majority creates, we explained that "we do not see how a court can say whether the juror in this instance was unduly biased without knowing why [he] answered as [he] did" and required that an evidentiary hearing must be held to elicit that knowledge.  French I, 904 F.3d at 118.  But, jury selection in French I involved no individualized voir dire and thus the district court had not previously had an

opportunity to meet with the prospective jurors, pose questions, and assess their levels of credibility and bias in advance of ruling on the misconduct claim.  Id. at 115-16.

Here, by contrast, both the trial court and the parties were permitted to question the prospective jurors at length on a wide range of topics including their answers to the juror questionnaire.  Thus, when the district court ruled on Tsarnaev's claims of misconduct, it was in a much better position to consider the potential for bias than the district court was in French I. Under these circumstances, we should not reach to find that it was an abuse of the trial court's discretion to determine that no further questioning was needed to resolve the claims of misconduct. See United States v. French, 977 F.3d 114, 122 (1st Cir. 2020) ("French II") ("This is not a situation where the court simply let the juror decide for herself whether she was biased without investigating further.").

And, despite the majority today seemingly holding that a district court must always determine the reasons for dishonesty before ruling on bias, when French I returned to us after the evidentiary hearing ordered in that case, we held that the district court had adequately eliminated any concern about bias despite its inability to discern the reason for the juror's dishonesty.  Id. at 125.  We explained that, there, the district court was nonetheless "able to exclude the most obvious indicators of bias

from the evidence that was in the record" and to rule out any possible "explanation that would reveal disqualifying bias" and thus did not abuse its discretion in denying the motions to strike the subject juror in that case. Id. at 125-26.

So too here. Armed with ample evidence and its personal experience of having met with the two jurors, the district court supportably determined that, whatever the reasons for their alleged dishonesty, the jurors were not biased. See Def. Br. add. at 322 ("There are various possible explanations [for the alleged misconduct] and none of them is, in my view, serious enough to warrant changing our provisional qualification, and in particular, none of the issues that were raised seem to me to suggest the presence of a bias that would be harmful to jury impartiality in this case."). Accordingly, the court acted within its discretion, and our circuit's precedent, when it determined that Tsarnaev failed to meet his burden of proving juror bias by a preponderance of the evidence. See French I, 904 F.3d at 121("Though a defendant need only present a colorable claim to trigger an investigation, he or she nonetheless retains the burden to prove juror bias by a preponderance of the evidence based on that investigation." (internal quotation marks omitted)).

### III.

Because a proper application of the relevant standard of review reveals no abuse in the district court's handling of

Tsarnaev's misconduct claims, I must respectfully dissent from Section II of the majority's decision.  I would instead affirm the sentence imposed by the district court.